## ADAMS *v.* STEVENS & CAGGER.

An *action at law* lies by a *counsellor* against his client, upon a contract either express or implied, to recover compensation for services rendered. He may recover under a *quantum meruit,* notwithstanding the provisions of the *fee bill* established by the legislature.

Whether a party who performs the duties of *counsel* in a cause of which he has charge as attorney, is entitled on an *implied promise* merely, to recover of his client for servcies as counsel anything beyond the amount specified in the fee bill, *quere?*

ERROR from the Supreme Court. An action was brought by Stevens & Cagger against Adams, for the services of Stevens as *counsel* in arguing two causes for the defendant, in this court. The case was heard by referees who made a report in favor of the plaintiffs for $300, which the defendant moved to set aside, on the ground that an action does not lie for the recovery of compensation for services rendered as counsel, beyond the fee prescribed by statute, viz. $3.75, in each cause. Messrs. Stevens & Cagger were not the *attorneys* of Adams in the prosecution of the writs of error, but Mr. *Stevens* was retained as *counsel* by Adams to argue the two causes. The supreme court refused to set aside the report, and rendered judgment for the plaintiffs. See the opinion delivered by Mr. *Justice* COWEN, in the supreme court, 23 *Wendell* 57, *et seq.* The defendant sued out a writ of error. The cause was argued here by:

D. *Wright*, for the plaintiff in error.

S. *Stevens*, for the defendants in error.

After advisement, the following opinions were delivered:

By the CHANCELLOR. The question presented in this case is whether, by the laws of this state, a counsellor who is employed to argue a cause for his client, under an agreement to pay him a greater compensation for his services than the nominal counsel fee mentioned in the statute, can sustain an action to recover that compensation. *Blackstone* lays it down as the established law of England, that a counsellor cannot sustain a suit for his fees; and he cites for this purpose the case of *Moor* v. *Row*, 1 *Rep. in Ch.* 38, in the time of Lord Coventry, 1629, where a demurrer was allowed to a bill brought by a counsellor against a solicitor for counsel fees, which the latter had agreed to account for periodically. He also refers to the decree of the Emperor Claudius, mentioned by Tacitus, limiting the amount of gratuity which the advocate should be permitted to receive. It has also more recently been decided in England, that the practice of physic is a mere honorary employment; and that the medical practitioner cannot by suit recover a compensation for his services, but must be content to take such compensation only as is voluntarily offered. *Chorley* v. *Bolcot*, 4 *T. R.* 317. *Lipsecombe* v. *Holmes*, 2 *Camp. N. P.* 441. I am not aware of any case in which it has been definitively decided, even in England, that a barrister cannot recover upon an *express contract* to pay him a specific sum for his services as counsel; but in the case of *Turner* v. *Phillips*, 1 *Peake's N. P. C.* 123, in which Lord Kenyon expressed the opinion that money paid to a barrister for his services, could not be recovered back; he mentioned it as the general opinion of the profession, that the fees of barristers and physicians were as a present from the client or patient, and not a

payment or compensation for services. It was upon this principle, I presume, that he decided the case of *Fell* v. *Brown*, *Id*. 96, where he held that an action would not lie against a barrister for gross negligence in conducting the cause of his client.

This rule of considering the services of barristers and physicians as gratuitous merely, and as not entitling them to any legal claim to compensation, is supposed to have been derived from the civil law. But, as I understand that law, the advocate might recover upon an *express promise* to pay his honorary fee, although there was no implied promise arising merely from the relation of advocate and client. Among the early institutions of Rome, when the relation of patron and client existed between the patrician and the plebeian, the patron, who had accepted the promise of fidelity from the client, was bound to render him advice and assistance, and to sustain him in his litigations, without any other fee or reward than that which the client was bound to render him at all times, in virtue of his general relation of client. The relation which existed between them was similar to that of parent and child, or rather that of master and slave. But in the progress of society, when the relations of patron and client towards each other had totally changed—when the business of advocating causes in the courts had become a profession, and before the credit system pervaded all the relations of life, the client paid his advocate a fee in advance for his services, which was called a gratuity or present. As this was a mere honorary recompense, the client was under no legal obligation to pay it. But the result necessarily was, that if the usual present was not given, the advocate did not consider himself bound in honor to undertake the advocation of the cause before the courts. Afterwards, Marcus Cincius Alimentus, the tribune of the people, procured the passage of the law known as the *Cincian* law, prohibiting the patron or advocate from receiving any money or other present for any cause; and annulling all gratuities or pre-

1841.

Adams
v.
Stevens &
Cagger.

sents made by the client to the patron or advocate. But as no penalty was prescribed for the breach of this law, it of course became a dead letter. The Emperor Augustus afterwards re-enacted the *Cincian* law, and prescribed penalties for its breach. But towards the end of his reign, the advocates were again authorized to receive fees or presents from their clients. The Emperor Tiberius also, permitted them to receive such forced gratuities. This led to the abuse referred to by Tacitus, and induced the senate to insist upon the enforcement, or rather the re-enactment of the *Cincian* law; or rather the law limiting the amount of the fees of advocates, as referred to by Blackstone. 3 *Black. Comm.* 29, *note* 12. Nero revoked the law of Claudius; which was subsequently re-enacted by the Emperor Trajan, with the additional restriction that the advocate should not be permitted to receive his fee, or gratuity, until the cause was decided. 1 *Dupin, aine* 39. The younger Pliny mentions a law not referred to by Dupin, which authorized the advocate, after the pleadings in the cause had been made and the judgment had been given, to receive the fee which might be voluntarily offered by the client, either in money or a promise to pay. See *Merlin, art. Honoraires.* Erskine, in his Institutes of the Law of Scotland, understands the law in the digest *De extraordinariis cognitionibus,* as authorizing a suit for the fee of a physician or advocate, without a previous agreement for a specific sum. 2 *Ersk. Inst. by MacAllan* 695.

Whatever may have been the case in Rome itself, it is settled by the law of Scotland, where the civil law prevails, that an action may be sustained on a promise to compensate an advocate or a physician, for his services. See *Stair's Inst., by Brodie, B.* 1, *tit.* 12, *art.* 5, *and note b.* 2 *Bell's Law Dict., tit. Fees. Ersk. Inst., B.* 3, *tit.* 3, *art.* 32. *McKenzie* v. *Burntisland, Mor. Dic. of Decis.* 11421. But in relation to the fees of physicians, the legal presumpsion there is, that they were settled at the time, except the fees for attending the patient in his last sickness; or where

an agreement for a credit is proved; or where, by the cus-  **1841.**
tom of the place where the services are performed, the ser-
vices of the physician are not paid for until the termination  Adams
of the sickness of the patient.  *Johnson* v. *Bell, Mor. Dic.*  Stevens &
                                                                 Cagger.
*of Decis.* 11418.  *Hamilton* v. *Gibson, and Flint* v. *Alex-*
*ander, Id.* 11422.

It appears also to be the law of France, that the advo-
cate may recover for his fees by suit.  *Sirey Recuel Gene-*
*rale de Lois, tom.* 22, *pt.* 2, *p.* 141.  But it appears to be
considered dishonorable by the Parisian bar to bring suits
for counsel fees; and those who should attempt to do it
would be immediately stricken from the roll of advocates.
1 *Dupin, aine's Prof. D'Avocat,* 110, 698.

Whatever may be the practice of other countries, how-
ever, the principle never has been adopted in this state
that the professions of physicians and counsellors are mere-
ly honorary, and that they are not of right entitled to de-
mand and receive a fair compensation for their services;
especially where there is an agreement to pay them a fixed
compensation, or such a reasonable remuneration for their
services as those services shall be deemed to be worth.
The distinctions of patron and client, which formed one of
the fundamental laws of ancient Rome, ceased in this state
when slavery was abolished; and it is wholly inconsistent
with all our ideas of equality to suppose that the business
or profession by which any one earns the daily bread of
himself, or of his family, is so much more honorable than
the business of other members of the community as to pre-
vent him from recovering a fair compensation for his servi-
ces on that account.  I have no doubt, therefore, that by
the law of this state, as it has always existed from the time
of its first settlement, the lawyer, as well as the physician,
was entitled to recover a compensation for his services;
and that such services were never considereed here as gra-
tuitous and honorary merely.

It is supposed, however, that as the fee-bill has fixed
certain allowances for counsel fees, no greater compensa-

1841.

Adams
*v.*
Stevens &
Cagger.

tion than is there specified can be recovered as between solicitor and client. But such has not been the construction of the law of this state, fixing a tariff of fees from time to time. The counsel fees specified in the statute, have always been considered as merely fixing the rate of allowance of taxable costs, as between party and party; for, as Merlin says, it would be unreasonable for the party who fails in his cause to have to support the weight of the generosity of the adverse party to his own counsel. *Merlin*, *tit. Avocat*, § 13. The language of the former fee-bills of 1789, of 1801, and of 1813, was much stronger than that which is contained in the Revised Statutes on the subject; for, in those laws, the fee-bill commenced with a declaration that no officer, or other person, should exact, demand, or ask, or be allowed, any greater or other fee or reward, for or in respect of any service to be done or performed, than such as was in those fee-bills specified. The courts, however, did not consider that as limiting the amount which the counsel was to receive from his own client, for trying or arguing his cause. In *Staats* v. *The Executors of Ten Eyck*, decided in 1805, 3 *Caines' Rep.*118, where the grantee who had been evicted was permitted to recover against his grantor, upon the covenant of warranty, his costs of defending the ejectment suit, Mr. Justice Livingston says, " in costs are included reasonable fees of counsel, as well as those which are taxable." And his decision in that case has been uniformly followed in the courts of this state in similar cases; which certainly could not have been allowed, if the courts had considered it illegal for counsel to demand or receive, as a counsel fee from his own client for the trial of the cause at the circuit, any thing beyond the $3.75 which was taxable as between party and party. The decision in the case referred to, is in conformity with one recently made in the courts of France; where it was held that the fees which were due from the party to the advocate who had been employed in the defence of his cause, were not limited to the taxable fees

specified in the tariff. That the taxable fees were established merely to fix the sum due from the party who failed in the suit, and not to fix a price upon the services of the advocate; the amount of which should be according to the importance and difficulties of the services to be performed. *Sirey, tom.* 29, *pt.* 2, *p.* 287.

I do not intend to express any opinion upon the question whether a counsellor, who is the attorney or solicitor in a suit, can, without any specific agreement with his client upon the subject of counsel fees, charge and recover, on an implied promise merely, any thing more than the taxable costs and counsel fees stated in the fee-bill; but where a party employs counsel and agrees to give him a specific allowance for his services, or to pay him what those services shall be reasonably worth, I think, by the laws of this state, the counsel thus employed may receive from his own client a compensation beyond the nominal counsel fee specified in the fee-bill, without subjecting himself to indictment for a misdemeanor, or rendering himself liable to the penalty of treble damages to the client; and if compensation is not made to him for his services, according to the agreement, I think he has a legal right to sue and recover such compensation.

For these reasons, the judgment of the supreme court should be affirmed.

By *Senator* LEE. A fee-bill or tariff of charges is necessary as between party and party to regulate the allowance to be made to a prevailing party in a suit for his costs and expenses, occasioned by the improper action of his adversary, whose unfounded prosecution if plaintiff, or unjust withholding from the plaintiff his rights if defendant, has rendered such costs necessary; and for this purpose alone a fee-bill is wanted, as without it the avenues to our courts would in a great measure be closed against the poor.

As it respects the compensation to be made to the attorney, solicitor or counsel by his client for his services, there

1841.

Adams
*v.*
Stevens &
Cagger.

is no more necessity or propriety in its being fixed by le-. gislation, than that the compensation for the services of the other learned professions, the *clerical* and *medical*, should thus be regulated; and it would be more difficult thus to settle such compensation by legislation justly and equitably, than it would be to fix the per diem allowance of the day laborer, the agriculturist or the mechanic, in respect to whom such regulations, if attempted, would be found mischievous, and would not be submitted to by the community. It is more consistent with our free institutions, and more beneficial to the public that the matter should be left to be arranged by agreement of the parties, or settled by courts and juries, where no specific agreement can be shown. A fee-bill, as between the parties, will serve as a guide for the liquidation of the demand between attorney, solicitor, counsel and client, where there is no agreement, no general practice, and nothing in the case rendering such rule unsatisfactory.

In an experience of some forty years with the practice of the courts, I have never known counsel, in their claims on their clients, limited to the fee-bill. When our circuits were holden by the judges of the supreme court, and the standard of professional talent was low in the country, many of our most distinguished counsellors used to accompany the circuit judge in his circuit. Did any one ever dream that their compensation was to be limited to the allowance in the fee-bill ? Such was not and has not been the understanding or the practice of the profession, of the courts, or of the people.

In support of the view, that the fee-bill is only intended as between party and party, it may be observed, that in the practice in criminal cases, although there is a fee-bill for the district attorney, necessary as between him and the accused, who are frequently amerced with costs, and as between him and the people whose attorney he is, and who having no one as between them and their officer to watch their interest or make a bargain for them, usually

make their own agreement, by employing these agents and officers with fixed salaries or specified perquisites in lieu thereof, yet that fee-bill is silent as to the compensation the attorney and counsel of the accused may demand for the services they may render—that being left entirely to be settled by agreement expressed or implied between the attorney and counsel and their clients, generally the most needy and helpless beings with whom they have professional intercourse, and upon whom extortion could most easily be practised.

This view of the subject is, I think, confirmed by the late Chancellor Kent. That distinguished jurist and upright judge, by a resolution of the assembly in the year 1828, was requested to furnish a new tariff or bill of fees proper to be allowed in the court of chancery. He complied with the request, and accompanied a bill furnished by him, with practical and explanatory remarks. He observes, " Chancery suits will frequently be very expensive, from the importance and amount of the matters in controversy, and the long and intricate inquiries that they inevitably lead to; and it arises from the appropriate subjects of equity jurisdiction, such as mistakes, frauds, trust, accounts, partnerships, and the specific performance of contracts. In cases of serious litigation no fee-bill ever did, or ever can remunerate the solicitor or counsel for one-half their services. A great part of that burden always falls on their own clients." Thus expressly stating his understanding, that the fee-bill reported by him was in no way a limitation of the just claim of the solicitor and counsel *on his own client*, who had to bear and respond to those claims, for which no fee-bill ever did or could provide; which is as true in suits in courts of law as in chancery.

If the construction of the statute contended for by the plaintiff in error, is the true construction, that no officer or other person to whom any fee, or compensation is allowed by law for services rendered, shall take or receive any

other or greater fee or reward for such service, but such as is allowed by the law of the state; and that any person violating this provision (thus construed) shall be guilty of a misdemeanor, and liable in addition thereto to the party in treble damages, it will be found that we are subjecting our citizens to criminal prosecutions and suits for damages to a fearful extent, in cases where they never apprehended they were violating any law, criminal, social or moral. The statute provides that *each witness* for attending in his own county shall receive *twenty-five cents* for each day's attendance, and twenty-five cents for every thirty miles travel in coming to or returning from the place of attendance. Is the witness, whose expenses are borne by the party, amounting to from one to three dollars a day, and who is transported by him to and from court, liable to be convicted of a misdemeanor for extortion, and is the party for this act of honesty in supporting the witness, whom he thus drags from his domestic circle and his business, to be charged with using means of corrupting his witness, as he must be, if this is a true reading of the statute ? and yet how are aged, infirm and impoverished witnesses to be enabled to obey and comply with the mandates of the courts without means of conveyance or support ? And how, also, in this view of the statute, are distant witnesses to be subpœnaed ? The statute gives twelve and a half cents for this service, but nothing for travel; who, for such compensation, will perform the service ? It may be added, that the taxed bill as -between party and party is never esteemed any thing more than *prima facie,* if even that, between counsel, attorney and client, for in practice, the party subpœnaes his witnesses and pays them, or what is more usual, instead of the per diem fee, transports and supports them, and yet these items are included in the taxed bill against the losing party; and the client claims that the bill against him be opened to be taxed on notice to him that he may oppose the taxation thereof.

The doctrine that counsel fees are merely honorary, like a barrister's or serjeant's in England, is not consistent with our utilitarian policy and practical notions; it has never been recognized in our country, and is in opposition to the general tenor of our laws. The statute under consideration, gives a limited compensation, thereby repudiating the notion of honorary services; and if the statute (as contended) is a limitation as between counsel and client, it expressly prohibits the reception of gifts, presents and gratuities, which is a distinguishing badge of those honorary services in England, and by which counsel there are rewarded. Our statute prohibits the *taking* or *receiving* of any thing beyond the fee stated therein. 2 *R. S.* 542, § 5.

In conclusion, I am of opinion that the fee bill is necessary only as between party and party; and was primarily intended to operate only as between the parties, and not as between the client and his attorney, solicitor or counsel. I am, therefore, in favor of an affirmance of the judgment of the supreme court.

By *Senator* VERPLANCK. The language of the Revised Statutes, in the title regulating the fee-bill, is such as to give the general impression that it inhibits every officer or other person, whose legal fees are therein mentioned, from receiving, under any circumstances, any greater compensation than is there allowed. In regard to most of the officers whose fees are thus fixed, as clerks, sheriffs, and the like, it cannot be doubted that the policy and intent of the legislature are in accordance with the most obvious and primary interpretation of the statute. But according to this general interpretation, the statute prohibits counsel from receiving, or taking, or recovering, under any circumstances, a fee beyond the statutory allowance of $3.75, for an argument of any cause in the supreme court. This would lead to consequences so hostile to justice, to the known usages and understanding of business, and in fact to the ordinary necessities of life, as well as to such very

1841.<br>Adams<br>v.<br>Stevens &<br>Cagger.

1841.

Adams
v.
Stevens &
Cagger.

contradictory interpretation of the statute itself, as cannot well be supposed to have been within the actual design of the legislature. The practical inconveniencies and absurdities of such a law need not be enlarged upon; especially after the opinion of Judge Cowen in this case.

Nevertheless, I must adhere to the wise rule of *Buller* and *Ellenborough* and *Abbott*, which, to my mind, appears (as I have before had occasion to maintain in this court,) to be the necessary rule of interpretation of all republican legislation: that mere reasons of public convenience, or presumed or probable legislative intent, cannot have force to set aside the plain words of a statute in their ordinary sense, unless those words have before acquired some other fixed technical meaning, and then that must be followed. But in cases of really doubtful interpretation, the policy and object of the law, the coherence and consistencies of its separate provisions, are to be received as strong evidence of the true meaning. Still the intent thus pointed out, ought only to be judicially acknowledged when it falls, (to use the language of a former opinion,) " within some reasonable meaning of the words actually employed." Adhering to this principle of interpretation, and feeling the inconvenience and absurdity of the results to which the *prima facie* construction of our statute, as to counsel fees, would lead, let us examine what is probably the intended meaning of the statute, within a reasonable sense of the words employed.

The Revised Statutes, *title* 3, *chap.* 10, *part* 3, 2 *R. S.* 517, 2*d ed.* enact that " for certain services (therein enumerated,) done or performed in the several courts of law or equity in this state, by the officers thereof, the following fees *shall be allowed.*" Such a provision gives the right to demand and receive the specified fees from the persons for whom the services were performed, and to recover the amount as costs upon judgment in the action in which the services were rendered, from the losing party. This title, however uses no words to exclude any agreement, express

or implied, for higher compensation between any officer or other person, whose services are *under his own control*, and may or may not be rendered, according to his own views of convenience or interest. It has no negative words. The clerk, the sheriff, the judge, the commissioner, the master, *must* do the duty committed to him by law when demanded; he can give no consideration for any special agreement for higher compensation; if he demand it as a condition of doing his duty, he transgresses that duty and violates his oath of office. With perhaps a very few exceptions, none of these duties are discretionary. Not so with the counsellor. He may decline or refuse any professional engagement, as he is prompted by interest, feeling or even caprice or pleasure. If he may decline positively, he may also, unless the law expressly prohibit him, give his services conditionally upon such pecuniary compensation as may be agreed upon between his client and himself, or as may be fixed by professional usage, which is but a more general implied understanding and agreement. There is nothing either in the express words of the statute, or in the general law respecting contracts for professional services, to prevent or invalidate such a contract.

Then, by a succeeding title (4,) of the same chapter, it is further enacted that " no judge, justice, sheriff, or *other officer* whatsoever, or *other person*, to whom any fees or compensation shall be allowed by law for any services, shall take or receive any other or greater fee or reward for such services than such as shall be allowed by the *laws of this state*." 2 *R. S.* 542, § 5. If the view I have just taken of the different relative rights and duties of ministerial and judicial officers and those of professional advocates or attorneys, be correct, irrespectively of .this provision, then it must follow, that the public officer whose duty it is to perform any required service, and who has a compensation fixed and allowed for such performance, cannot " take or receive any other or greater fee or reward," than that

expressly allowed in the statute, without being subject to the inhibitions and penalties of the section; since no other or higher fee is " allowed by the law of the state." He can make no bargain in the matter. Having accepted office, the duty is imposed on him by law and his compensation fixed. But on the other hand, if any person to whom the act " *allows*" a specific sum for certain services, *may also legally decline such services*, or render them in consideration of a larger agreed compensation, and he does render them for what he thinks an adequate compensation, he makes a contract express or implied, which is no where forbidden in the statute. In such case he does not take or receive more than " is allowed by the laws of this state," though it may be ten times as much as the statutory fee, which may be recovered against the opposite party. To him therefore, the penalties and prohibitions of this title do not apply. Although this chapter does not allow him a higher reward or fee than that specified, the general laws of the land do allow him the compensation agreed upon. As it ought never to be presumed that the legislature intended to interfere with the private contracts and understanding of men; as this interpretation corresponds with the ordinary usages of society, and therefore the probable intention of the legislature, and as it falls within a fair and reasonable sense of the words used, though not the first and most obvious, I agree with the construction of Judge Cowen, and think with him, that an express or implied agreement for a higher compensation for counsel services is not prohibited by the spirit or literal words of the statute, and that the referees had the right to decide from the evidence before them upon the compensation thus agreed upon, or the value of the services thus contracted for.

Yet perhaps a formal opinion, after solemn argument on this matter, ought not to pass over in total silence the English doctrine that the rewards of counsel, like those of graduated physicians, are not the subjects of legal demand

or enforcement.  This point does not need elaborate dis-
cussion.  The question is one of contract for the remune-
ration of services rendered, and this may be either express
or implied.   Where the usages or prejudices of society are
such as to make a direct charge for professional services dis-
creditable, there will be no express stipulation or charges, and
this of course excludes any probability of an implied agree-
ment.  Accordingly Judge *Blackstone* speaks of the coun-
sel fee as " a mere gratuity, which a counsellor cannot
demand, without doing injury to his reputation;" 3 *Black.
Comm.* 29; and Lord *Kenyon*, in deciding an analogous
question against the right of a physician to sue for his bill,
said: " It has always been understood in this country, that
the fees of a physician are honorary and not demandable of
right.   *Chorley* v. *Bolcot*, 4 *T. R.* 317.   With us it is not
so understood as to the one case, nor is there any thing
discreditable in the other.   The usage and understanding
being wholly different, the construction and effect of the
implied contract must be so also; for indeed even in Eng-
land it could hardly be denied, that a previous express
bargain for professional services supported by the con-
sideration of such services duly rendered, could be en-
forced in law as well as any other contract.   Besides, so
entirely does this rule depend upon arbitrary custom in
Great Britain, that when you cross the Tweed it ceases,
for the *Scotch law* holds that, " honoraries may be pur-
sued;" i. e. physicians and counsellors may sue for their
fees.   When such contracts are not discreditable or un-
heard of, an implied agreement for the usual and fair com-
pensation of such services may be presumed.   Were this
at all doubtful upon principle, it would be settled by our
statute law, and the practice under it, which has for more
than fifty years allowed counsel fees to be recovered as
costs attendant upon judgments.

In a land wedded to old usages, we know that habit or
prejudice may still keep up a distinction in form, that has
long ago passed away in substance, and thus compel the

1841.

Adams
*v.*
Stevens &
Cagger.

1841.

Adams
v.
Stevens &
Cagger.

counsellor and the licentiate physician to look only to their honorary fees, whilst the surgeon or solicitor may sue for his bill; but in our own " Bank Note World," on this side the Atlantic, and in an age when the greatest poets or novelists are willing to confess that they toil " for gain, not glory," it is ridiculous to attempt to perpetuate a monstrous legal fiction, by which the hard working lawyers of our day, toiling till midnight in their offices, are to be regarded in the eye of the law in the light of the patrician jurisconsults of ancient Rome, when

> —— dulce dici fuit et solemne reclusa,
> Mane domo vigilare, clienti promeri jura;

and who at day break received the early visits of their humble and dependent clients, and pronounced with mysterious brevity the oracles of the law.

As my only doubt or difficulty in this case has been the fear of giving such a general construction to the statute, as would legalize extortionate bargains for services required by law, from the various ministerial officers whose fees are fixed in the same chapter; and as the distinction above stated has fully satisfied my mind on that score, I am for affirming the judgment of the supreme court.

On the question being put, *Shall this judgment be reversed?* all the members of the court present, who heard the argument of the cause, answered in the *negative.* Whereupon the judgment of the supreme court was AFFIRMED.