In the Matter of the Application of JANE KNAPP, Executrix, etc., to Compel Payment by her Attorney, of Moneys received by him as such.

An attorney has a lien for his compensation for professional services, and for disbursements, upon moneys received by him on his client's behalf, in the course of his employment.

This right of lien is not affected by the fact that the client is an executor

and the services were rendered, and moneys received on behalf of the estate ; nor is it confined to moneys recovered by judgment.

*Austin* v. *Munro* (47 N. Y. 360), *Bowman* v. *Tallman* (2 Robt. 385), distinguished.

Upon summary application against an attorney to compel him to pay over moneys alleged to have been unlawfully retained by him, he is entitled to have a clear case made out against him.

Where it appears that an attorney retains his client's money claiming a lien thereon, and upon the facts stated the right is clear and only the amount in question, the court has jurisdiction to determine that question, on application to compel the payment of the moneys retained, although the items of the attorney's account are such as in ordinary cases would subject them to taxation.

*It seems* that the question may be determined by the court at Special Term, by a referee, or by a jury passing upon an issue sent to it.

Upon application to compel M., an attorney, to pay over moneys collected and received by him, upon a claim belonging to the estate of K., of whose will the petitioner was executrix, M. claimed a lien for professional services and disbursements, and it appeared that he retained therefor, $4,000. In answer to the application, M. presented his affidavit with a statement of his charges and disbursements, footing up $6,000.43. The rendition of the services was not disputed, but only their value and the right to retain the money. The referee to whom the matter was referred reported that "$4,000 is a just and reasonable compensation * * * for the services rendered," and upon the report the application was denied. The General Term on appeal reversed this order and directed M. to pay over $1,500, holding that some of the charges were too much. *Held*, that M. had the right to a lien on the moneys ; and that as for all that appeared the deduction suggested by the General Term had been made by the referee and the Special Term, they allowing $4,000 only on a bill of $6,000.43, without discrimination of items, while the items objected to by the General Term amounted to less than the sum so deducted, M. was entitled to a lien for the amount retained and the General Term order was error.

(Argued April 19, 1881 ; decided May 19, 1881.)

APPEAL from order of the General Term of the Supreme Court, in the first judicial department, made September 8, 1880, reversing an order of Special Term, which denied a motion on the part of the petitioner, as executrix of the will of Stephen H. Knapp, deceased, to compel her attorney to pay over $4,411.50 alleged to have been unlawfully detained by him, out of moneys collected. The order of General Term

granted the motion to this extent, it directed said attorney to pay to the petitioner, or her attorney, within ten days after service of copy of the order, the sum of $1,500, and in default of such payment, gave the petitioner permission to apply, on one day's notice, to the court for an attachment as for contempt.

The facts are stated in the opinion.

*Samuel Hand* for appellant. The arbitrary sum of $1,500, directed by the General Term to be paid, was without any basis in the evidence and beyond the authority of the Supreme Court. (*Porter* v. *Parmlee*, 39 Sup. Ct. 219 ; *In re Fincke*, 6 Daly, 111; 52 N. Y. 493; *Whitehead* v. *Kennedy*, 69 id. 462.) The court has never exercised this summary power where there was a genuine dispute as to the *quantum meruit* of the attorney. (*Bowery Bank* v. *McGown*, 52 N. Y. 493.) The practice never has been to interfere summarily in such cases. (*Hodson* v. *Terrall*, 2 Dowl. P. C. 264 ; *Balsbaugh* v. *Frazer*, 19 Penn. St. 99 ; Bac. Abr., Attorney, H. ; *In re Paschall*, 10 Wall. 483.)

*John McCrone* for respondent. An attorney's lien is only for costs and charges in the suit and for sums due for professional business. (*Bowling Green Savings Bank* v. *Todd*, 52 N. Y. 489 ; *Whitehead* v. *Kennedy*, 69 id. 468 ; *Walker* v. *The American Bank*, 49 id. 659.) The moneys being trust funds, and the petitioner having alleged that in executing the power of attorney to the appellant she was not aware of the consequences of that act, a court ought not to sustain a lien in his favor. (*Henry* v. *Fowler*, 3 Daly, 190; *Austin* v. *Munro*, 47 N. Y. 360–365 ; *Ferrin* v. *Myrick*, 41 id. 315 ; *Bowman* v. *Tallman*, 2 Rob. 385 ; affirmed, 2 Hand, 619, *n*.) The Special Term erred in subjecting the petitioner's application to a reference, in view of the character of the attorney's account, and in denying the motion. (*Bowling Green Savings Bank* v. *Todd*, 52 N. Y. 483.)

Danforth, J. The petitioner applied to a judge of the Supreme Court for an order requiring A. M., an attorney and counselor of that court, to show cause why he should not pay to her the sum of $4,411.50, with interest from July, 1878, or why, in default thereof, an attachment should not issue against him. Her petition stated that she was the widow of Stephen H. Knapp and his executrix; that at the time of his death there were pending certain proceedings to recover moneys due him from the city of New York for the erection of an "Armory"; that in these proceedings A. M. was his attorney and counsel, and she, having been substituted in her husband's place, continued his employment in the same capacity. The estate was insolvent, and the claim in question its only asset. These facts were known to the petitioner and to A. M. She avers the litigation was practically at an end, but that there existed some objection to the payment of the money, to obviate which legislation by the State became necessary; this was obtained, and under a power given by her, A. M., on the 19th of July, 1878, received from the comptroller $6,781.85, part of the money in controversy; that A. M., from time to time, paid the petitioner small sums of money, and on the 29th of October, 1878, sent her $1,000, saying it was the balance due to her from him. In January or February, 1879, proceedings were instituted against her in the Surrogate's Court by certain creditors of her deceased husband, and concerning which she employed counsel and caused demand to be made on said A. M., for the money received by him; in answer he furnished an account, a copy of which is annexed to the petition. It credits her with the full amount of the moneys awarded in her favor, $9,281.85, and charges her with various sums of money paid to her between July 3, 1877, and December 21, 1878, amounting to $2,982.03, with amount reserved to indemnify comptroller for claim of David Jones, $411.50; amount collected by Dewhurst by judgment, $1,888.32; with professional services and disbursements, $4,000; in all $9,281.85. Reference is also made by her to a statement furnished by A. M., which she says "exhibits items of charges for pretended ser-

vices and disbursements by him," adding: The payment to Dewhurst was unauthorized, $1,888.32; not paid, a bill to stenographers, $111.00; unlawfully reserved to pay Jones, $411.50; and charge for attendance and expenses at Albany, as not authorized by her, $3,001.18.

In answer to the application A. M. presented his affidavit, with a statement of his charges and disbursements in detail, and which seems to be a duplicate of the one last referred to by the petitioner. It foots up $6,000.43. Upon these the judge at Special Term made an order, whereby, after reciting the papers aforesaid, and declaring that from the affidavit of A. M., it appears that he retained the said sum of $4,411.50 as compensation to him for professional services rendered Stephen H. Knapp, in his life-time, and Jane Knapp as such executrix, after his decease, in and about the collection of $9,281.85, he appointed a referee " to take testimony as to the value of the services of said A. M. in the premises, and to report to the court what in his opinion is a just and reasonable compensation to the said A. M. for the services rendered by him," and directed that the motion upon the petition stand over until after the coming in of his report. From this order the petitioner appealed to the General Term, where it was affirmed. A hearing before the referee was had upon the petition to which I have referred — the answer of A. M. and his account. A. M. was also examined orally and cross-examined by counsel for the petitioner, and other witnesses were produced and examined and cross-examined in detail. It appeared from the affidavit of A. M., made in answer to the petition, that his employment by the petitioner's husband commenced in February, 1874; that the first proceeding was by mandamus, which, "after a difficult and protracted litigation," was rendered unavailing by reason of an act of the legislature, passed after argument in the mandamus case. Then followed an action at law. While this was pending Knapp died, leaving a will drawn by A. M. Its probate was contested, and in those proceedings he acted as proctor and counsel for the executrix, and after, he says, " a long contest," the will was sustained and

letters testamentary issued to her. The pending actions were then revived in the name of the executrix and continued. They were referred for trial and failed, upon the ground that the supervisors of New York had no authority to contract for the work in question. He thereupon endeavored to procure legislation at Albany, legalizing the proceedings of the supervisors in regard thereto. In the years 1875, 1876 and 1877 he gave to the matter his personal and continued attention, and on the last day of the session of 1877 the desired act was passed. Then came questions before the governor growing out of some informality in the certificate of the speaker of the assembly; correspondence with that officer followed, and with his co-operation the difficulty was removed. The bill was signed by the governor. By it a new tribunal or commission was created, and before that body A. M. again prosecuted the claim, with such effect as to obtain an award for the full amount. He asserts that in all his labor with reference to the passage of the bill he was unaided, and it is apparent, except for persistent effort and watchfulness on his part, this measure of relief would have failed. The difficulties before the commission were aggravated by a claim to a part of the same moneys interposed in behalf of one John Dewhurst, who alleged an assignment thereof executed by the testator. This also was litigated and disallowed. But soon after the award in favor of the petitioner and before its payment, Dewhurst commenced an action against the executrix, and the comptroller of the city, to have paid out of said award the share claimed by him, and the comptroller was enjoined by the court from paying over any of the award until the determination of the action. A. M. procured a modification of the order, but in the meantime one Jones appeared, claiming an interest to the extent of $400. Other creditors of the testator also intervened, and the comptroller refused to pay unless advised to do so by the corporation counsel. This made necessary conferences by A. M. with that official. His opinion, when at last given, was in aid of the claim, and $6,781.85 was, paid over, the balance being retained by the comptroller to

meet claims arising upon assignments executed by the testator. This included the amount of the Dewhurst claim. A motion to dissolve the injunction order was denied, the Special Term sustaining the demand ; and thereafter, as the result of efforts made by A. M. for its adjustment, a meeting of the attorneys on both sides was had, at which Dewhurst and Jane Knapp were also present, and the claim, with her approbation, settled. Judgment was allowed to be entered by him for the amount agreed upon, and it was paid. The comptroller required A. M.'s bond of indemnity for the amount of the Jones claim, and it being given, the sum was paid over to him. He also states that during the entire time that he was working for Mr. Knapp, and the petitioner, he never received a single dollar, either as compensation for his services as attorney or counsel, or to reimburse him for money expended ; that he has paid out in their business over $1,000, besides advancing to the petitioner from time to time moneys out of his own pocket with which she might pay the rent of the premises occupied by her, she stating to him that " she had no one else to whom she could look to save herself from being turned into the street." He also states, that the petitioner was kept fully informed of every step taken in these matters, the adverse result of the earlier proceedings, and that it was necessary to go to the legislature for relief, where he "would endeavor to secure the passage of the requisite act ;" she was familiar with all his efforts on her behalf, knew of his progress, and offered " to render any assistance she might be able to facilitate the passage of the bill." The account shows that for all his services and disbursements he retains the sum of $4,000, and the further sum of $411.50, to indemnify him upon his bond to the comptroller. The insolvency of the petitioner is apparent. Upon the hearing before the referee it further appeared that Mr. Knapp employed A. M., after failing through other attorneys to secure his claim. His services and proceedings are stated with much minuteness as to time and circumstances. In regard to those at Albany, he prepared the proposed statute, appeared before various committees, and sought by personal interviews

with members of the legislature to obtain favorable consideration for his measure. The cross-examination by the petitioner's counsel was at least fearlessly conducted, and no sentiment of professional courtesy was permitted to stand in the way of a rigid performance of the duty which he owed to her. The examination in no respect diminished the weight of the narrative contained in A. M.'s affidavit, or disclosed any omission on his part of scrupulous fidelity to his client, or failure to perform to the utmost the service he had undertaken. He also called as witnesses two " able and honorable lawyers," as they are characterized in the opinion of the learned judge at General Term, one of whom was for six years a judge of the Superior Court of the city of New York, and both of whom were practitioners of at least twenty-five years' experience. The first testified that the services rendered by A. M., as detailed in evidence, were reasonably worth $5,900, and that this conclusion was reached by taking each item of service and affixing to it such value as the witness considered it worth. The other named $3,500, in addition to disbursements, as a reasonable and proper charge. No witnesses were called by the petitioner. The referee returned to the court the testimony taken by him, and reported that, after carefully considering the same, he was of opinion that " the sum of $4,000 is a just and reasonable compensation to the said A. M. for the services rendered by him in the premises." Upon due notice the application for the order first referred to was again brought to the attention of the court, and an order made by which, after reciting the proceedings above stated, the petition and affidavit of the respective parties, and the report of the referee, the application was denied. Upon. appeal to the General Term this order was reversed and the application " granted to the extent that the said A. M. be directed to pay to said Jane Knapp or to her attorney, within ten days, the sum of $1,500, out of the moneys collected by him as her attorney, and in default of such payment " she had leave to apply on one day's notice for an attachment against the said A. M. It is this order which is now before us.

The application of the petitioner to the court must have been

upon the theory that the attorney was its officer, bound to do no wrong, but to act " with all good fidelity, as well to the court as to his client," and in these respects subject to its jurisdiction. So far the power of the court over the conduct of its officers is absolute and exclusive; " necessary," as is said by Marshall, Ch. J., " for the preservation of decorum, and the respectability of the profession" (*Ex parte Burr*, 9 Wheat. 531), and to those ends to be exercised in a summary manner, according to its discretion and judgment. It may, therefore, regulate the manner in which the attorney shall exercise his calling, but can lawfully go no further. That it has done so in this case is the first contention on the part of the appellant. His counsel argues that the order of the General Term was without any foundation in the evidence and beyond the authority of the Supreme Court. On the other hand it is claimed that the petitioner was entitled to have paid to her the entire sum received by her attorney ; that it all belonged to her, and that she was at once entitled to its possession. Her demand was upon that theory. It excluded the possibility that under any circumstances the attorney had a right to retain or charge the fund, either by application upon his account or by way of lien; and this was her position, although the employment of the attorney and the performance of service by him was admitted. The judge whose interference to enforce her demand was first invoked appears to have assumed the contrary, for he directed an inquiry as to " what is a just and reasonable compensation " to the attorney " for the services rendered by him," a fact quite unimportant if he had no right or interest in the money. The same inference is permitted from the order of the General Term affirming the order for this inquiry. The subsequent order of the judge denying the application when it was shown that the value of the attorney's services exceeded the sum of money held by him, and even the General Term, in making the order appealed from, go upon the ground that the attorney was not destitute of some justification in refusing to comply with the petitioner's demand, for otherwise its order would have required the payment

over of all money he had received. But even now the conten-
tion of the respondent is that such order should have been
made; that the order of the Special Term unduly protects the
attorney and invests his office " with an extraordinary preroga-
tive, at which the alarm of suitors may well be awakened,"
and her learned counsel pointed out the injurious effect upon
the profession, and the injustice to the client of an adjudication
which upholds the attorney's right to retain his compensation
from moneys collected by him. The doctrine was criticised
as if it was new and depended for its support upon recent de-
cisions. On the contrary the general proposition that an at-
torney has a lien for his costs and charges upon deeds or pa-
pers, or upon moneys received by him on his client's behalf in
the course of his employment, is not doubted, nor does it
stand upon questionable foundations. It comes to us *super
antiquas vias.* As early as the year 1734 it was held by Lord
Chancellor TALBOT to arise upon a contract implied by law and
as effectual as if it resulted from an express agreement. (*Ex
parte Bush,* 7 Viner's Abr. 74.) In 1779, in *Wilkins* v.
*Carmichael* (1 Doug. 101), Lord MANSFIELD declared that the
practice which protected it " was established on general prin-
ciples of justice, and that courts, both of law and equity, had
carried it so far that an attorney or solicitor may obtain an
order to stop his client from receiving money in a suit in which
he has been employed for him, till his bill is paid." And in
*Welsh* v. *Hole* (1 Doug. 238), the same judge held that " an
attorney has a lien on the money recovered by his client for
his bill of costs. If the money come to his hands, he may
retain to the amount of his bill. He may stop it *in transitu*
if he can lay hold of it. If he apply to the court, they will
prevent its being paid over till his demand is satisfied." In-
deed he was inclined to go still further, and to hold that if
the attorney gave notice to the defendant not to pay till his
bill should be' discharged, a payment by defendant after such
notice would be in his own wrong, and like paying a
debt which had been assigned after notice. PARKE, B., in
*Barker* v. *St. Quintin* (12 M. & W. 451), refers to this decis-

ion as establishing the attorney's claim to the equitable inter-
ference of the court, to have the judgment held as a security
•for the debt due to the attorney, or after notice to compel
the defendant to pay its proceeds over again. In our own
State this was so well settled that Kent, in his Commentaries
(vol. 2, p. 641), puts it down as an established principle, that
the attorney has two liens for his costs, one on the papers in
his hands, and the other on the funds recovered. No new
rule, therefore, was enunciated in *Bowling Green Savings Bank
of N. Y.* v. *Todd* (52 N. Y. 489), where it was said that " the
lien of the attorney   *   *   * attaches to the money re-
covered or collected upon the judgment."

It is plain, then, that the right of lien exists. Its origin
should not be lost sight of. The declaration in *Ex parte
Bush* was restated by Chancellor Eldon in *Cowell* v. *Simp-
son* (16 Ves. 279); where he describes it as "*prima facie* a
right accruing through an implied contract;" and as it exists in
favor of those who have bestowed labor and service upon
property in its repair, improvement or preservation, the agree-
ment implied must be that the person rendering it shall re-
tain the property until compensation is made. The lien of an
attorney stands on no higher ground. In *Ex parte Yalden*
(L. R., 4 Ch. Div. 129), James, L. J., says: " The things
upon which they claim a lien are things upon which they have
expended their own labor or their own money;" and asks:
" Why are they not to have that lien in the same way as any
other workman who is entitled to retain the thing upon which
he has worked until he is paid for it ? " And in like manner
in the recent case of *Coughlin* v. *N. Y. C. & H. R. R. R. Co.*
(71 N. Y. 443), the lien of the attorney upon a judgment re-
covered by him is upheld upon the theory that his services and
skill procured it. Wherever it exists it is supported by the
courts. In the case of a horse trainer, Best, Ch. J., says:
" As between debtor and creditor the doctrine of lien is so
equitable it cannot be favored too much " (*Jacobs* v. *Latour*,
5 Bing. 130) ; and this remark is quoted by Sugden, L. Ch.,
and applied to the case of a solicitor claiming a lien in *Blun-*

*den* v. *Desart* (2 Dr. & W. 427). It, however, does not stand alone upon the equity or justice of the common law as interpreted by the courts. It was secured to the English attorney and solicitor by statute 18 Vict.; and to the profession in this State by section 66 of the new Code, Laws of 1879, declaring that "the compensation of an attorney or counselor for his services is governed by agreement, express or implied, * * * " and that "from the commencement of an action or the service of an answer containing a counter-claim, the attorney who appears for a party has a lien upon his client's cause of action or counter-claim, which attaches to a verdict, report, decision or judgment in his client's favor and the proceeds thereof in whose ever hands they may come." It may be said that the case of A. M. is not within the letter of this provision, for although an action was commenced, the termination was not in favor of his client, and the money in his hands is not the proceeds of any judgment in an action. But it is within its purpose, and is within the principle of the common-law doctrine to which I have referred. *Ormerod* v. *Tate* (1 East, 464) brought up the question upon an arbitration, and it was contended that the attorney's lien was confined to the case of money recovered by judgment of the court, and did not extend to money awarded. But Kenyon, C. J., ruled otherwise, and put his decision upon "the convenience, good sense and justice of the thing." Now in the case before us there was but one claim placed in the hands of the attorney; he received it in his professional character, and each item of service was directed to its enforcement. At the beginning he brought an action, and failing in that, without fault on his part, sought to have removed by legislation the impediment which stood in the way of a recovery. In this he was successful. The act of 1877 (Chap. 473) was enacted, the liability of the city of New York to pay for labor and materials expended in the erection of its armories was declared, and a commission created to determine upon the validity and amount of claims relating thereto. It had judicial functions to perform and was to be governed in its procedure "by the rules and practice appli-

cable to suits at law." Its determination was to be certified in writing, and made final and binding upon all parties concerned. (Laws of. 1877, chap. 473, §§ .2, 3.) The claim in question was prosecuted before this body and was enforced by its determination. The rights of the attorney are not other than they would have been if the same result had followed the judgment of a court of law. It is evident that in all he did from the moment of his retainer until the receipt of the money he was acting in a professional character, and that the petitioner, as well as himself, understood that the relation of attorney and client existed between them to the end.

We have seen that his fees are regulated by no statute, and that they depend on contract. It is true also that there is no evidence of any express agreement between them as to the rate or measure of compensation, or as to the source from which he was to be paid, but an agreement or understanding as to the latter may be implied from the facts and circumstances of the case. His client was insolvent ; the claim in his hands was the only asset of the estate. The client neither contributed to the disbursements in any of the proceedings, nor did she have the ability to do so. She was herself the subject of aid. She had not paid the attorney any thing, nor does she now offer to pay him any thing. It cannot be doubted that both expected the attorney would, in case of success, look to the fund recovered, for reimbursement for money out of pocket and payment for his own labor. But there is also evidence of such an understanding. The attorney in his affidavit made in answer to her petition, and to which on the final hearing of her application she had an opportunity to reply, states that " he informed her of the risk he was assuming in devoting so much of his time and labor in the attempt to collect this claim, and the expense to which he was put, and which could never be repaid unless he succeeded in securing the passage of the bill and obtaining an award from the commission." This is not denied by her. Its occurrence accords with the condition of the parties, and it is probable that the minds of both met on that statement. But there is enough in the narrative of either party to establish on

her part an obligation to pay for such services as he might render, and on the part of both an agreement that his compensation should be taken from the award.    Indeed, I do not understand the respondent's counsel to assert the contrary.    His contention in terms is that "the fund was not bound by any contract of the petitioner, she being an executor."    But the cases cited in its support (*Austin* v. *Munro*, 47 N. Y. 360; *Ferrin* v. *Myrick*, 41 id. 315; *Bowman* v. *Tallman*, 2 Robt. 385) do not apply.    They relate to actions upon contracts for the recovery of money, and have no relation to a case where a right of lien exists upon a fund.

It must be borne in mind that the attorney was not before the court asking for its favor or protection.    He was taken there and made subject to its summary jurisdiction because charged with misconduct.    He was entitled to have a clear case made out against him.    Enough has been said to show that the attorney has such a right of lien; the right, therefore, to retain and possess the fund until the lien is satisfied; and the extent of that lien is, as assumed by the General Term, " compensation for his professional services rendered and for disbursements expended by him."    But he cannot be permitted to determine its amount; nor can his client.    In England the question would be sent to the taxing master with the bills and the attorney; and with us, before the Code, to the clerk of the court, who in our practice acts as taxing master. (*People* v. *Smith*, 3 Cai. 221.)    But now that the compensation is undefined, depending upon a *quantum meruit* unless limited by express agreement (Code, § 66; *Rooney* v. *Second Ave. R. R. Co.*, 18 N. Y. 368; *Marshall* v. *Meech*, 51 id. 143; *Whitehead* v. *Kennedy*, 69 id. 462; *Wright* v. *Wright*, 70 id. 96; *Coughlin* v. *N. Y. C. & H. R. R. R. Co.*, 71 id. 443; *Zogbaum* v. *Parker*, 55 id. 120), such a tribunal would be unsatisfactory.    A mere inspection of the account, and examination of fee-bills would afford no light.    Where, upon the facts stated, the right is clear and the amount only in question, it could well be determined by a referee, or by the judge himself at Special Term, or by a jury passing upon an issue

sent to it.   It seems the English courts refuse a summary in-
terference unless the facts are settled or conceded; not for want
of jurisdiction, but because they "would have too much to do
upon affidavits." (*In re Phelps & Dodd*, 3 Jurist, 479.)   In
*In re Millard* (1 Dowl. Pr. 140), an application was made
that M., an attorney, deliver up certain deeds on payment of
all costs that might be due on taxation.   But it was objected
that he had also a lien upon them for services rendered as so-
licitor employed by the moving party to raise money upon
them.   It was contended that the other party was liable for
those services ; but the court say : " He says you are bound to
pay him, and that he has a lien on these deeds.   That can only
be determined by a jury.   The court cannot interfere to try
the question of lien." *Hodson* v. *Terrall* (2 Dowl. Pr.
264), was a motion by client that the attorney pay over moneys
collected.   The taxed costs had been paid, and the attorney
claimed to retain for more.   The client and two other wit-
nesses swore the attorney agreed to conduct the proceedings
for taxed costs.   This was denied by the attorney.   The court,
BAYLE, J., said : "I think we cannot interfere.   You must go
before a jury who will be competent to decide whether there
was such an agreement."   But whatever mode is resorted to
the question is ultimately for the court.   It has jurisdiction
over the attorney's bill when the fact appears that he retains
his client's money, although the items of his account are not
such as in ordinary cases would subject them to taxation (*In
re Murray*, 1 Russ. 519 ; *In re Rice*, 2 Keen. 181; *In re
Aitkin*, 4 Barn. & Ald. 47 ; *In re Lord Cardross*, 7 Dowl.
Pr. Cas. 861 ; *In re Ford*, 8 id. 684) ; but to do justice it is
necessary that his lien should be discharged, and to ascertain
that, evidence must be resorted to.   The court cannot act arbi-
trarily and so tie the attorney's hands that the client may carry
off the fruits of his labor.   In *Marshall* v. *Meech* (51 N. Y.
140) there was no question as to the amount due, but a referee
was appointed to ascertain whether the opposing party, not the
client, but one to be affected, had notice of the lien.   So in
*Bowling Green Savings Bank* v. *Todd* (52 N. Y. 489), where

the question was as to the existence of the lien, and in the case before us, where the sole question related to the compensation of the attorney.  It extended, however, to the whole account.  Here the General Term had before it the petition, the affidavit, the evidence of the witnesses and the report of the referee.  We have carefully examined them, and agree with the counsel for the appellant, that they furnish no ground upon which the decision of the learned court can stand.

To uphold the order the learned counsel for the respondent refers to *Whitehead* v. *Kennedy* (69 N. Y. 468) and *Bowling Green Sav. Bank* v. *Todd* (52 id. 493).  In the first case, power on the part of the appellate court to reject certain items or claims embraced in the recovery is upheld, " provided," among other things, " the plaintiff consents to forego his claim to recover them ;" and in the second, it was held that no lien whatever existed in favor of the person who set it up.  In both, the facts were undisputed, but neither of the conditions found in those cases exist here.  As to the amount of compensation due to the attorney there is diversity of opinion.  Neither the attorney nor the witnesses agreed.  As to the rendition of services there was no dispute, and the order of reference made by the Special Term and affirmed by the General Term against, it is said, opposition by the petitioner, intimate very emphatically that the only question for consideration was that of value. And this seems now the result reached by the General Term.

It is plain that the petitioner sought to deal hardly with her attorney.  Her application, if successful, would have taken from his hands the fund to which he looked for compensation, and left him with a cause of action against an insolvent estate. No doubt he was bound to content himself with a remuneration proportionate to his labor and the importance of the matter upon which it had been bestowed ; but she would deny him even his expenses, require him to forego pecuniary remuneration, and remit him for satisfaction to the enjoyment of that fanciful disinterestedness, which, under certain ancient professional rules of action, required the lawyer " to defend the rich from a sense of duty, and the poor from a kindly sense of in-

terest." They were unsuccessfully invoked in *Adams* v. *Stevens* (26 Wend. 451), and as practical guides, have been long since abandoned. On the other hand, the attorney appears to have acted in good faith. With no stipulation for a contingent fee, inflamed in view of exaggerated or apprehended difficulties, he fixed his claim for compensation after the business intrusted to him had been carried to a successful end, and subject, as he knew, to revision by the courts. That review has been had. His charges have been moderated by the judgment of the Special Term, founded upon the referee's report, but the General Term was " of opinion that the referee should have cut down certain charges to a more suitable figure," and direct that the attorney pay to the petitioner the sum of $1,500. It may be that those charges are excessive. The referee and Special Term considered the same items, and we are not called upon to examine them. But it should be observed that for aught that appears the deduction now suggested by the General Term was in fact made by the referee. The bill of the attorney, including the items to which the General Term calls attention, amounts to $6,000.43. It was the one under examination by the referee and the Special Term. The sum reported by the referee, and adopted by the Special Term as a reasonable compensation to the attorney for the services rendered by him, was $4,000, showing a deduction of $2,000. So that after deducting the sum of $1,500 from the same bill of items where those objected to appear, there would still remain due $4,500. In other words, the referee and Special Term allowed upon a bill whose items came to $6,000.43, the gross sum of $4,000 only, with no discrimination of items, while the General Term, with the same bill of items before it, object to certain specific items, and upon those objections make the order complained of. If that court had simply deducted those items from the bill where alone they appeared, the balance remaining would have exceeded the sum allowed by the referee. The learned judge says : " The referee fixed the value of his " (the attorney's) " services at a gross sum." " We cannot," he adds, " distinctly see that he allowed

any particular item as charged in the account, but we think it our duty to scrutinize closely such items as seem to have no substantial basis." Now, it is quite apparent that the referee may have deducted the very items so objected to. As we have seen, he did reduce the amount by a larger sum, and if this order stands, it is hardly possible that injustice will not be done to the attorney. The items commented on are, one of $250 for general services, including interviews with creditors, one of $200 under substantially the same head, and charges for attendance and expenses at Albany during sessions of the legislature, and while the act referred to was being pressed. The learned judge remarks that it does not appear that improper appliances were used to procure the passage of the bill, " but," he says, " it seems strange that such long persistency of effort should have been required for its passage." It is to these charges the learned court refers, and in view of which the order is made. That the services were rendered is not denied. The passage of the act was indispensable to the collection of the demand. How far the attorney was stimulated to extraordinary exertions by the conviction that all his past labor in the case would be lost, and his expenses incurred in vain, unless in this measure he succeeded, we need not inquire ; that such conviction was entertained and was well founded appears from the condition of the estate. But if the abatement was made which the learned court suggests, it would still leave his admitted lien equal to all the moneys in his hands, and no arithmetical device can alter his equity.

The order of the General Term should be reversed and the order of the Special Term affirmed, but without costs, and without prejudice to the right of the petitioner to bring an action, if she is so advised.

All concur, except Folger, Ch. J., and Earl, J., dissenting ; Andrews, J., not voting.

Ordered accordingly.