# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 10, 2015          Decided September 1, 2015

No. 14-5138

SHELBY COUNTY, ALABAMA,
APPELLANT

v.

LORETTA E. LYNCH, IN HER OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00651)

*Bert W. Rein* argued the cause for appellant. With him on the briefs were *Brendan J. Morrissey* and *J. Michael Connolly*. *William S. Consovoy* and *Thomas R. McCarthy* entered appearances.

*Dale Ho* argued the cause for intervenor-appellees. With him on the brief were *Jon M. Greenbaum*, *Sherrilyn Ifill*, *Janai S. Nelson*, *Christina A. Swarns*, *Ryan P. Haygood*, *Natasha M. Korgaonkar*, *Leah C. Aden*, and *Deuel Ross*. *Moffatt L. McDonald*, *Arthur B. Spitzer*, and *John M. Nonna* entered appearances.

*Nathaniel S. Pollock*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Mark L. Gross*, Attorney.

Before: TATEL and GRIFFITH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Circuit Judge* TATEL.

Opinion concurring in the judgment filed by *Senior Circuit Judge* SILBERMAN.

GRIFFITH, *Circuit Judge*:

Shelby County, Alabama, prevailed in a challenge to the constitutionality of section 4 of the Voting Rights Act of 1965 (VRA) and now seeks attorneys' fees from the Government under the Act's fee-shifting provision. The district court found that Shelby County was not entitled to receive fees because its victory did not advance any of the goals Congress meant to promote by making fees available. We agree.

I

The historical and legal background to this dispute has been set out several times over the history of this case. *See Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2619-21 (2013); *Shelby Cnty., Ala. v. Holder*, 679 F.3d 848, 853-58 (D.C. Cir. 2012), *rev'd*, 133 S. Ct. 2612; *Shelby Cnty., Ala. v. Holder*, 43 F. Supp. 3d 47, 50-52 (D.D.C. 2014); *Shelby Cnty., Ala. v. Holder*, 811 F. Supp. 2d 424, 428-41 (D.D.C. 2011), *aff'd*, 679 F.3d 848 (D.C. Cir. 2012), *rev'd*, 133 S. Ct. 2612 (2013).

We assume familiarity with those discussions and will cover only the topics relevant to this fee dispute.

A

In the aftermath of the Civil War, the Nation ratified the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution in an effort to stamp out the race-based forms of legal oppression that the states had imposed throughout the first century of the Republic. These amendments worked a profound change by sweeping away the most appalling forms of legal subjugation that had defined the pre-Civil War era. Black Americans now held the sovereign franchise and were entitled to equal treatment under the law. But racial prejudice is not only insidious, it is resilient. The serpent of state-sponsored racism remained in the garden and "the blight of racial discrimination" simply switched its focus to a new battleground and "infected the electoral process" that black citizens had only begun to enter. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). Almost as soon as Reconstruction ended, a number of states adopted a variety of devices to suppress the newly established franchise of black citizens. *Id.* at 310. Literacy tests, grandfather clauses, poll taxes, and property qualifications prevented black Americans from voting at all. *Id.* at 310-11. And cunning district design and other tactics almost completely diluted the political power of black citizens. *See Shaw v. Reno*, 509 U.S. 630, 640 (1993).

It was not until the 1950s that Congress began to take action to secure the promise of equal citizenship extended after the Civil War; among other things, Congress passed three statutes authorizing individual suits to protect voting rights. *Katzenbach*, 383 U.S. at 313. But case-by-case litigation proved too slow, so Congress enacted a

further-reaching solution to "rid the country of racial discrimination in voting," *id.* at 315: the Voting Rights Act of 1965. The VRA contained two principal provisions. The first, section 2, created a permanent, nationwide replacement for earlier civil rights statutes and authorized individual suits against any state or local jurisdiction that adopted a voting practice that had a discriminatory purpose or result. *See Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). The second, section 5, was even more dramatic: It imposed on "covered jurisdictions" the requirement of obtaining "preclearance" for "all changes in state election procedure" from a three-judge federal district court in Washington, D.C., or from the Attorney General before they could take effect. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 198, 203 (2009). The scope of section 5 was set by a formula in section 4 of the Act that covered any state or political subdivision that met certain telltale criteria of discriminatory voting practices as of November 1, 1964. *See Shelby County*, 679 F.3d at 855. The scope of this intrusion onto state affairs, Congress found, was justified by the severity and intractability of the problem posed by racial discrimination in voting. Under the older case-by-case approach to litigating voting abuses, progress had been "painfully slow," in part "because of the intransigence of [s]tate and local officials and repeated delays in the judicial process," but also because "even after apparent defeat resisters [sought] new ways and means of discriminating." H.R. Rep. No. 89-439, at 9-10 (1965). "Barring one contrivance too often . . . caused no change in result, only methods." *Id.* at 10. In the face of this record, Congress concluded that there was "little basis for supposing" that without legislative action "the [s]tates and subdivisions affected will themselves remedy the present situation . . . ." S. Rep. No. 89-162, at 19 (1965). "Thus, to keep minorities from continuing to be victimized by [s]tates and political subdivisions' actions, Congress sought, through [sections 4

and 5] to 'shift the benefit of time and inertia from the perpetrators of evil to the victim.'" H.R. Rep. No. 109-478, at 8 (2006) (quoting *Katzenbach*, 383 U.S. at 328).

"The historic accomplishments of the Voting Rights Act are undeniable." *Northwest Austin*, 557 U.S. at 201. "The Act . . . proved immensely successful at redressing racial discrimination and integrating the voting process." *Shelby County*, 133 S. Ct. at 2626. The change wrought by section 5 in particular can hardly be overstated. As Congress put it when reauthorizing the VRA in 2006, section 5 was a "vital prophylactic tool[], protecting minority voters from devices and schemes that continue[d] to be employed by covered [s]tates and jurisdictions." H.R. Rep. No. 109-478, at 21; *see also id.* at 24 ("[T]he existence of [s]ection 5 deterred covered jurisdictions from even attempting to enact discriminatory voting changes."); S. Rep. No. 94-295, at 19 (1975) ("[I]t is largely [s]ection 5 which has contributed to the gains thus far achieved in minority political participation. Moreover, it is [s]ection 5 which serves to insure that this progress shall not be destroyed through new procedures and techniques.").

The coverage formula in section 4 and the preclearance regime in section 5 of the VRA were both originally subject to five-year sunset clauses. *Northwest Austin*, 557 U.S. at 199. When their scheduled expiration drew near in 1970, Congress renewed both provisions and once again set an expiration date for five years later. The House supported the reauthorization by a vote of 272 to 132, the Senate by a margin of 64 to 12. J. Morgan Kousser, *The Strange, Ironic Career of Section 5 of the Voting Rights Act, 1965-2007*, 86 TEX. L. REV. 667, 687 (2008). When the next deadline approached in 1975, Congress reauthorized both provisions yet again with a seven-year sunset clause, this time by a vote of 346 to 56 in the House and 77 to 12 in the Senate. *Id.* at 705-06. In 1982, with the

seven-year window coming to an end, Congress reauthorized both provisions a third time, but added a twenty-five-year sunset clause. The House voted for reauthorization 389 to 24 and the Senate 85 to 8. *Id.* at 707. Finally, in 2006, Congress again reauthorized both provisions for another twenty-five years. In the House, 390 members supported reauthorization, with 33 opposed. *Id.* In the Senate, the vote was 98 to 0 in favor of reauthorization. *Id.* When he signed the reauthorization into law, President George W. Bush remarked: "The Voting Rights Act . . . broke the segregationist lock on the ballot box . . . . Today, we renew a bill that helped bring a community on the margins into the life of American democracy." Press Release, Office of the Press Secretary, The White House, President Bush Signs Voting Rights Act Reauthorization and Amendments Act of 2006 (July 27, 2006), 2006 WL 2076688, at *1-2. Because of this series of reauthorizations, neither section 4 nor section 5 ever expired. Congress made some changes to the provisions along the way, twice altering the basic coverage formula in section 4 so that it would include even more jurisdictions. *Shelby County*, 133 S. Ct. at 2620.

B

Shelby County, Alabama, was covered by the section 5 preclearance regime under the formula set out in section 4 of the VRA and challenged the constitutionality of both in a suit filed in district court in the District of Columbia.

After losing in the district court and before us, Shelby County ultimately prevailed when the Supreme Court ruled the coverage formula unconstitutional. *Shelby County*, 133 S. Ct. at 2631. The Court explained that "'the Framers of the Constitution [also] intended the [s]tates to keep for themselves, as provided in the Tenth Amendment, the power

to regulate elections.'" *Id.* at 2623 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991)). Moreover, "[n]ot only do [s]tates retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the [s]tates." *Id.* (quoting *Northwest Austin*, 557 U.S. at 203). The Court held that the VRA constituted a departure from those principles by infringing on the sovereignty of the states to design their own electoral process and burdening only some states while leaving others unaffected. *Id.* at 2623-24. Congress could only impose burdens that departed so significantly from constitutional norms if the burdens were justified under "current conditions." *Id.* at 2627. But, the Court explained, the coverage formula had never evolved to match the Nation's social and political changes. Congress had "ignore[d] these developments, keeping the focus on decades-old data relevant to decades-old problems, rather than current data reflecting current needs." *Id.* at 2629. Congress could not, the Court explained, impair the equal dignity of the states and infringe on their sovereignty simply by relying on the existence of a problem in the past. *Id.* Because the coverage formula did not adequately target contemporary conditions, the Court struck it down. *Id.* at 2631.

On remand to the district court, Shelby County filed a motion for attorneys' fees, seeking $2 million in fees and $10,000 in costs. The 1975 amendments to the VRA had introduced a fee-shifting provision at section 14(e) of the Act, which provides:

> In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable [attorneys'] fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs.

52 U.S.C. § 10310(e).[1] Shelby County insisted that it had prevailed in an "action or proceeding to enforce the voting guarantees" of the Fourteenth and Fifteenth Amendments (which, for ease of reference, we shall term the Reconstruction Amendments) and so should receive fees under section 14(e). The Government opposed. The district court sided with the Government, concluding that Shelby County was not entitled to fees because, far from helping ensure compliance with the VRA, its lawsuit had explicitly opposed Congress's enforcement mechanism by trying—and succeeding—to have the coverage formula declared unconstitutional.

Shelby County timely appealed. We have jurisdiction over a final order of the district court under 28 U.S.C. § 1291. As the question in this case is whether the district court correctly applied the proper legal standard to determine whether Shelby County should receive fees, we review the decision de novo. *See Conservation Force v. Salazar*, 699 F.3d 538, 542 (D.C. Cir. 2012).

II

---

[1] The Voting Rights Act was originally codified in Title 42 of the United States Code. Section 14(e) was first codified as 42 U.S.C. § 1973*l*(e). On September 1, 2014, the Office of the Law Revision Counsel recodified the VRA and other provisions related to voting and elections into a new Title 52. *See* Editorial Reclassification, Office of the Law Revision Counsel, http://uscode.house.gov/editorialreclassification/t52/index.html (last visited Sept. 1, 2015). We will cite to the current version of the Code.

We agree with the district court that Shelby County is not entitled to fees.

A

The rules governing this dispute are straightforward. Fee-shifting provisions set out the criteria a court must use to determine whether a party is even *eligible* for fees. In addition to those statutory criteria, the Supreme Court has also created an additional requirement: A party can only receive fees if it also shows that it is *entitled* to them, meaning that its victory in court helped advance the rationales that led Congress to create fee-shifting provisions in the first place. Though the entitlement requirement does not appear in the text of any fee-shifting provision, the Supreme Court has enforced it on a number of occasions and both this court and Congress have accepted that a prevailing party must show entitlement to receive a fee award. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418 (1978) ("The terms of [the fee-shifting provision in Title VII] provide no indication whatever of the circumstances under which [a prevailing party] should be *entitled* to attorney's fees." (emphasis added)).

The Court has also explained that the primary rationale for such fee-shifting provisions—and the only rationale on which Shelby County relies to justify its entitlement to fees here—is encouraging private parties to bring civil rights lawsuits by protecting them from the costs of litigation. In no circumstances is a fee award a prize. Nor is it a bonus form of compensation to a litigant whose position the court finds sympathetic. It is an inducement to private parties to engage in favored activity. A party is entitled to fees only when it shows that its success in litigation advanced the goals Congress intended the relevant fee-shifting provision to promote. When a party's success did not advance those goals, it is not entitled to fees.

The Court first explained this standard in *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968). In *Piggie Park*, a district court had refused to award fees to parties who unmistakably prevailed in a suit brought under Title II of the Civil Rights Act of 1964. The Court found that refusal an error. The prevailing parties were entitled to fees and so the district court was required to award them. The Court explained that Congress meant for fee-shifting provisions in civil rights statutes to encourage private parties to bring their own civil rights litigation. Congress was well aware that "the Nation would have to rely in part upon private litigation as a means of securing broad compliance" with Title II, given the obvious impossibility of the federal Government identifying and prosecuting every violation. *Id.* at 401. Indeed, the Court continued, a private party bringing a civil rights suit "does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest priority." *Id.* at 402 (internal quotation marks omitted). Yet without a provision enabling prevailing parties to recover their fees, "successful plaintiffs" would be "routinely forced to bear their own attorneys' fees," meaning that "few aggrieved parties would be in a position to advance the public interest" by bringing civil rights litigation. *Id.* This obviously posed a problem, given congressional awareness that private litigation was an indispensable element of any successful enforcement program. *See, e.g.*, *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969) ("The achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General."). Congress solved this problem with fee-shifting provisions. In other words, Congress enacted fee-shifting provisions to encourage victims of discrimination to invest the resources needed to litigate civil rights violations and to distribute the cost of successful enforcement among

lawbreakers. Because the prevailing parties in *Piggie Park* had acted as "the chosen instrument of Congress," *Christiansburg Garment*, 434 U.S. at 418, by helping to "secur[e] broad compliance" with Title II, *Piggie Park*, 390 U.S. at 401, they were entitled to fees.

Decades ago, we held that the *Piggie Park* standard also governs claims for attorneys' fees under the VRA. *See Donnell v. United States*, 682 F.2d 240, 245 (D.C. Cir. 1982) ("'Congress depends heavily upon private citizens to enforce the fundamental rights involved [in the Voting Rights Act]. [Fee] awards are a necessary means of enabling private citizens to vindicate these Federal rights.'" (quoting S. Rep. No. 94-295, at 40 (1975))). Shelby County insists that it is entitled to fees under *Piggie Park*. We disagree. Shelby County is not entitled to fees because its challenge to the constitutionality of the coverage formula did not help "secur[e] broad compliance with" the VRA. *Piggie Park*, 390 U.S. at 401.

As a general matter, a plaintiff who prevails in a lawsuit in connection with a civil rights statute typically will have helped enforce that statute exactly as Congress hoped and so will usually be entitled to fees under *Piggie Park*. *See Piggie Park*, 390 U.S. at 402 ("[O]ne who succeeds in obtaining an injunction under [Title II] should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."). But the Court has made very clear that success in a lawsuit alone does not resolve the separate question of whether the successful party is entitled to fees. *See Christiansburg Garment*, 434 U.S. at 418 (explaining that merely prevailing in an action under Title VII "provide[s] no indication whatever of the circumstances under which [the prevailing party] should be *entitled* to attorney's fees." (emphasis added)). Instead, entitlement turns on whether the

prevailing party's success advanced the purposes Congress meant to promote by making fees available—in particular, under the *Piggie Park* standard, whether the prevailing party helped "secur[e] broad compliance" with the civil rights statute in question. *Piggie Park*, 390 U.S. at 401.

For example, in *Christiansburg Garment*, an employer was accused of wrongful discrimination in violation of Title VII of the Civil Rights Act of 1964. 434 U.S. at 414. The defendant employer prevailed in the subsequent litigation, proving that it had not discriminated unlawfully. Having prevailed in a Title VII suit, the defendant was thus eligible for fees under the text of the statute's fee-shifting provision. The defendant insisted that it was also entitled to fees under *Piggie Park* for the same reason: It had won in court and so should receive fees. The Court rejected this argument. The *Piggie Park* standard entitles parties to receive fees for which they may be eligible only when they shoulder the burden of acting as "the chosen instrument of Congress" and "vindicate 'a policy that Congress considered of the highest priority'" by enforcing compliance with a statute. *Id.* at 418 (quoting *Piggie Park*, 390 U.S. at 402). The defendant employer in *Christiansburg Garment* did nothing more than prove it had not engaged in the alleged misconduct. Therefore, even though the defendant prevailed and was eligible for fees, it was not entitled to them under the *Piggie Park* standard.

The Court came to effectively the same conclusion in a different context in *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754 (1989). In *Zipes*, an intervenor union opposed the settlement of a Title VII class action by a class of employees against their employer, arguing that the collective bargaining agreement should preclude the employer from agreeing to the settlement. After the employees won judicial approval for the settlement of their

class action, they argued that they were entitled to have the intervenor pay their fees. Just as in *Christiansburg Garment*, the Court found that the plaintiffs were not entitled to fees, even though they had prevailed, because Congress did not mean to use fee-shifting provisions as a general reward for victory. *Id.* at 761-64. Instead, fee-shifting provisions are designed to further the "central purpose" of civil rights statutes—"vindicating the national policy against wrongful discrimination by encouraging victims to make the wrongdoers pay at law." *Id.* at 761. The plaintiffs in *Zipes* had not helped enforce compliance with Title VII by fighting with the intervenor union over which of the employer's legal obligations would take precedence. Therefore they were not entitled to fees from the intervenor under the *Piggie Park* standard.

In both *Christiansburg Garment* and *Zipes*, the Court also explained that Congress intended fee-shifting provisions in civil rights statutes to require parties who took "frivolous" or "unreasonable" positions to pay the fees of their successful opponents. *Christiansburg Garment*, 434 U.S. at 421; *Zipes*, 491 U.S. at 761. In both cases, the Court relied on this secondary rationale to craft a separate standard for fee awards to a party that successfully defeats such vexatious arguments. But in neither case could the prevailing parties rely on the *Piggie Park* standard because, though each party had won an action brought under a civil rights statute, neither had helped ensure compliance with the civil rights laws.[2]

B

---

[2] In both *Christiansburg Garment* and *Zipes*, the Court went on to conclude that the prevailing plaintiffs were not entitled to fees under the alternative frivolous litigation standard.

14

1

Section 14(e) of the VRA permits district courts to award fees to a party who prevailed in an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e). To show that it is eligible for fees under the statute, Shelby County must demonstrate that it prevailed in an action to enforce the voting guarantees of the Reconstruction Amendments. The Government concedes that Shelby County is a "prevailing party," but argues that it is nonetheless not eligible for fees because its lawsuit did not enforce the "voting guarantees" of the Reconstruction Amendments. As it turns out, this is a difficult question. The Government submits that the only "voting guarantees" secured by those amendments are individual voting rights and that Shelby County's lawsuit was aimed instead at vindicating the structural rights of states and other political jurisdictions. Shelby County insists to the contrary that the Reconstruction Amendments "reflect guarantees to individuals and states alike: to individuals, to be free from discrimination; and to states, to be free from unwarranted regulation." To settle this dispute we would need to determine what voting rights the Reconstruction Amendments actually guarantee.

However, Shelby County could not win fees even if it were correct about the contours of the Reconstruction Amendments. Section 14(e) serves only to identify those *eligible* for fees. As we have explained, the prevailing party must also show that it is *entitled* to fees. *See Christiansburg Garment*, 434 U.S. at 418 ("The terms of [the fee-shifting provision in Title VII] provide no indication whatever of the circumstances under which [a prevailing party] should be *entitled* to attorney's fees." (emphasis added)); *cf. Nationwide*

*Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 710 (D.C. Cir. 1977) (explaining that a prevailing party's "*eligibility* for an award of attorney fees does not mean that it is necessarily *entitled* to such an award" (emphasis added)).

As we will explain below, Shelby County is not entitled to attorneys' fees because its lawsuit did not advance any of the purposes that Congress meant to promote by making fees available. Therefore we do not need to determine whether Shelby County or the Government is correct about what "voting guarantees" are secured by the Reconstruction Amendments. Resolving that question is immaterial to the outcome of this case. And because we need not answer that constitutional question, we will not do so. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (advising courts "to guard jealously and exercise rarely our power to make constitutional pronouncements"); *PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further.").

2

We agree with the district court that Shelby County is not entitled to fees under *Piggie Park*. Shelby County's argument boils down to the proposition that Congress introduced the fee-shifting provision into the VRA in 1975 with the express goal of inducing a private party to bring a lawsuit to neuter the Act's central tool. But that makes no sense. As we know from numerous statements by the Supreme Court, Congress enacted fee-shifting provisions in civil rights statutes to "secur[e] broad compliance" with those statutes, not to immobilize them. *Piggie Park*, 390 U.S at 401. Nor did

Congress need to enlist private suits to challenge the constitutionality of the coverage formula in the way that it needed to rely on private parties to pursue individual enforcement litigation. *See id.* ("[T]he Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law."); *see also Allen*, 393 U.S. at 556 ("The achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General."). To the contrary, Congress carefully preserved the power to invalidate the coverage formula by repeatedly including a sunset provision that would ensure the formula's expiration at some point in the future absent new authorization. Because of these successive sunset clauses, invalidating provisions of the Act did not even require both houses of Congress and the President to agree. Either house of the legislature could have refused to pass reauthorizing legislation, or the President could have refused to sign it, and thereby invalidated the coverage formula or forced alteration to the provision by insisting on revisions before agreeing to reauthorization legislation.

In other words, Shelby County's lawsuit neither advanced Congress's purpose nor performed some service Congress needed help to accomplish. It defies common sense and ignores the structure and history of the Act to think otherwise. Therefore we conclude that Shelby County is not entitled to fees under the *Piggie Park* standard.

Shelby County tries to justify its entitlement to fees by relying on a number of counterarguments. None persuade us. Most importantly, Shelby County points to section 14(b) of the Act, which provides that "[n]o court other than the District Court for the District of Columbia shall have jurisdiction to issue any declaratory judgment . . . or any restraining order or

temporary or permanent injunction against the execution or enforcement of any provision" of the VRA. 52 U.S.C. § 10310(b). Shelby County argues that section 14(b) created a new cause of action authorizing constitutional challenges to the VRA. Therefore, the argument goes, Congress must have meant to encourage constitutional challenges. If not, it would have had no reason to establish a cause of action allowing private parties to bring such challenges. And if so, Shelby County insists that its success in striking down section 4 advanced Congress's purposes after all. On this peg Shelby County has hung its hopes.

But it is by no means clear that section 14(b) creates a new cause of action. The more natural reading is that the provision simply limits jurisdiction over constitutional challenges to the VRA to the District Court for the District of Columbia. The available evidence supports this view. To begin with, Congress had no need to create a new cause of action. The grants of jurisdiction in 28 U.S.C. § 1331 and in the Declaratory Judgment Act, 28 U.S.C. § 2201, provide adequate authorization for any attack on the VRA's constitutionality. Because parties already had all the authorization they needed to mount lawsuits arguing that the Act was not constitutional, Congress had no need to create a new cause of action for such suits. We also note that Attorney General Katzenbach's testimony during the Senate hearings on the VRA strongly suggests that section 14(b) is a venue provision.[3] During the Senate hearings, General Katzenbach

---

[3] Attorney General Katzenbach was one of the principal drafters of the VRA. *See Dougherty Cnty., Ga., Bd. of Ed. v. White*, 439 U.S. 32, 37 (1978). The Court has often relied on his testimony to Congress regarding the Act to help illuminate the statute's terms. *See, e.g.*, *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 376

was asked the purpose of section 14(b). He explained that it would channel all significant VRA litigation, enforcement suits and constitutional challenges alike, into one court, and prevent multiple parallel constitutional challenges unfolding in courts throughout the country. *To Enforce the 15th Amendment to the Constitution of the United States: Hearing on S.1564 Before the S. Comm. on the Judiciary*, 89th Cong. at 144 (1965) (statement of Nicholas Katzenbach, Attorney General of the United States) ("[T]he [preclearance] determinations are to be made in the three-judge court in the District of Columbia . . . . And it seems to us that if the integrity of that practice were to be preserved, then you had to have a corresponding provision here, otherwise you are going to have the act tested in a variety of different courts. So it seemed to us that the important thing was to get this act tested, to get it tested in one court, and not to interfere with the *jurisdiction* of that court, and provide an appeal to the Supreme Court." (emphasis added)). General Katzenbach said nothing about encouraging or authorizing constitutional challenges.

The Supreme Court seems to have put this issue to rest in *Allen v. State Board of Elections*, 393 U.S. 544 (1969). In *Allen*, the Court held that private citizens can sue for declaratory judgment that a jurisdiction must obtain preclearance for any change in voting practices. The Court also held that citizens could file such actions anywhere in the country, not only in the District of Columbia. In reaching this conclusion the Court explained that section 14(b) imposed a "*restriction*" on lawsuits authorized by some other cause of

---

(2000); *McCain v. Lybrand*, 465 U.S. 236, 247 (1984); *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 128 n.15, 142-46 (1978); *Allen*, 393 U.S. at 567.

action; it never suggested that the provision authorized or created a cause of action for suits. *Id.* at 560 (emphasis added). The Court also noted that section 14(b) presented a "question involving the *jurisdiction* of the district courts," not involving the right of parties to bring lawsuits. *Id.* at 557 (emphasis added). The discussion in *Allen* strongly indicates that section 14(b) is only a venue provision. And a number of other Supreme Court cases that mention section 14(b) in passing also uniformly refer to it as a venue provision, not as a cause of action. *See Shaw v. Reno*, 509 U.S. 630, 637 (1993) (noting that section 14(b) "vests the District Court for the District of Columbia with exclusive jurisdiction to issue injunctions against the execution of the Act"); *Hathorn v. Lovorn*, 457 U.S. 255, 267 (1982) (noting that section 14(b) raised a "jurisdictional" issue); *Katzenbach v. Morgan*, 384 U.S. 641, 645 (1966) (noting that, "[p]ursuant to [section] 14(b)," parties challenging the VRA's constitutionality had "commenced [their] proceeding in the District Court for the District of Columbia").[4]

Shelby County points to a single sentence in *Allen*, in which the Court referred to section 14(b) as one of the "Act's enforcement provisions" and said that a suit of the kind identified in section 14(b) "would involve an attack on the

---

[4] The Fifth and Ninth Circuits have also referred to section 14(b) solely as a venue provision. *See Brown v. City of Shreveport*, 158 F.3d 583, *1 (5th Cir. 1998) (per curiam) (unpublished) (citing section 14(b) to explain that "[t]he district court for the District of Columbia has exclusive jurisdiction over actions against federal officers or employees challenging the enforcement of the Voting Rights Act"); *Reich v. Larson*, 695 F.2d 1147, 1149 (9th Cir. 1983) (holding that, under section 14(b), constitutional challenges to the VRA "can only be brought in the District of Columbia district court").

constitutionality of the Act itself." 393 U.S. at 558. We do not understand why Shelby County thinks this remark helps its case. Given that section 14(b) requires any attack on the constitutionality of a VRA provision to be filed in federal court in the District of Columbia, all such cases necessarily come under the heading of a "section 14(b) injunctive action," irrespective of whether that section also serves to create a cause of action. The Court's remark in *Allen* therefore proves nothing either way.[5] And as we have just said, the rest of the Court's discussion of section 14(b) in *Allen* suggests much more strongly that the section is a jurisdictional venue provision, not a cause of action.

In any event, even if Shelby County were right that section 14(b) creates a cause of action—a dubious proposition given the evidence—the County still would not be entitled to fees under the *Piggie Park* standard. *Piggie Park* does not ask whether Congress intended to authorize Shelby County's challenge. The only question under *Piggie Park* is whether Congress intended to encourage constitutional challenges to the VRA as a way of "securing broad compliance" with the statute, *Piggie Park*, 390 U.S. at 401, and thus made attorneys' fees available to promote such challenges. Shelby County has not given us any reason to believe that Congress

---

[5] Shelby County also insists that the Supreme Court understood section 14(b) to create a cause of action when it mentioned in *Katzenbach v. Morgan* that "[p]ursuant to [section] 14(b)," the parties challenging the VRA's constitutionality in that case had "commenced [the] proceeding in the District Court for the District of Columbia." 384 U.S. at 645. Shelby County's reliance on *Katzenbach* is even more mystifying than its reliance on *Allen*. As we have already said, this remark apparently indicates that the Court in *Katzenbach* perceived section 14(b) as no more than a venue provision.

did so. Shelby County's lawsuit did not facilitate enforcement of the VRA; it made enforcing the VRA's preclearance regime impossible. And as we have already explained, Congress did not need to rely on private challenges to the Act's constitutionality. The fact that Congress may have created a cause of action permitting such a suit does nothing to persuade us, in the face of these other considerations, that Congress also intended to use fees to encourage suits that sought to strike down its own carefully crafted enforcement program. Therefore Shelby County's insistence that section 14(b) creates a cause of action is irrelevant.

Shelby County tries to bolster its argument by explaining all the reasons why Congress might have regarded constitutional challenges to the VRA as socially beneficial. But as we have already said, the *Piggie Park* standard does not determine fee entitlement based on whether Congress would applaud or condemn an individual litigant. Instead, entitlement under *Piggie Park* turns on whether Congress intended to use fees to encourage the prevailing party's litigation as part of a program for ensuring compliance with the Act. Though Shelby County may have vindicated other values, invalidating one of the VRA's central provisions did not promote compliance with the Act.

Shelby County's other arguments are no more persuasive. For example, Shelby County insists we must find it entitled to fees because winning this lawsuit enforced the voting guarantees of the Reconstruction Amendments. This argument thoroughly misses the point. Whether Shelby County defended the rights secured in the Reconstruction Amendments is relevant to whether the County is *eligible* for fees, not whether it is *entitled* to them. We do not decide whether Shelby County is right about the contours of those Amendments because we do not need to do so. Shelby County

did not help secure compliance with the VRA by convincing the Court to strike down the VRA's signature statutory device. Therefore Shelby County is not entitled to fees under *Piggie Park*.

Shelby County also points out that "nothing in the legislative history suggests that Congress was disavowing promotion of other types of litigation authorized under the statute . . . ." Perhaps, but the legislative history does make clear that Congress intended for courts to award fees under the VRA, pursuant to the *Piggie Park* standard, when prevailing parties helped secure compliance with the statute. Most notably, the Senate Report explains that Congress was adopting section 14(e) because the Nation "depends heavily on private citizens to enforce" the Act. S. Rep. No. 94-295, at 40 (1975). Shelby County cannot plausibly argue that Congress "depend[ed] heavily on private citizens" to bring constitutional challenges to the coverage formula, especially because the sunset provision empowered even one house of the legislature to invalidate section 4 by refusing to support reauthorization.

Shelby County insists that if it is not entitled to fees, the incentives to bring VRA actions would be distorted. Other jurisdictions seeking to invalidate provisions of the VRA on constitutional grounds in the future would have to bear the costs of litigating those challenges, while facing the prospect, if they lost, of fee liability to private parties that intervened on the Government's behalf. The distorted incentives of which Shelby County warns seem at best hypothetical. Shelby County has not identified any case in which an intervenor-defendant has obtained fees from a plaintiff jurisdiction for helping the Government defend the VRA's constitutionality, nor have we found such a case ourselves. Thus Shelby County's fear that future unsuccessful challengers would face

the prospect of paying the fees of intervenor-defendants is mere speculation. Moreover, Shelby County does not seem to believe that these distorted incentives would actually materialize. In its reply brief Shelby County maintained that it would not have been liable for fees as to the intervenor-defendants in this case had Shelby County lost. But more to the point, even if we accepted Shelby County's prognostication and overlooked the internal contradictions of its argument, this issue is not relevant to our decision here. We need not decide whether our legal conclusion would actually create unequal litigation incentives or weigh the undesirability of that consequence as a matter of policy. Such considerations are the province of Congress, not the courts.

Shelby County also argues that finding it not entitled to fees would merely constitute punishment because we dislike the results of Shelby County's success even though "unsympathetic litigants" routinely win fees when they prevail under civil rights statutes. Appellant's Br. 33-34. As an initial matter, we reject Shelby County's premise. Our decision in no way rests on any assessment of the social value of Shelby County's suit. Nor do we find Shelby County not entitled to fees based on the assumption that it brought this suit as an "opponent of individual voting rights." *Id*. at 43.

What is more, Shelby County misapprehends the cases on which this argument relies. The "unsympathetic" litigants Shelby County identifies won fee awards when they helped to enforce the statute in question, irrespective of whether the legal theory or practical effect of that suit was universally appealing. Some observers may be surprised, puzzled, or even upset when, pursuant to a fee-shifting provision, a court awards fees to a Caucasian man in a VRA suit, *see Maloney v. City of Marietta*, 822 F.2d 1023, 1026 (11th Cir. 1987), or a large corporation in a § 1983 suit, *see Sable Commc'ns of*

*Cal. Inc. v. Pac. Tel. & Tel. Co.*, 890 F.2d 184, 193 (9th Cir. 1989), or even wealthy plaintiffs who sued a state government, *see Lavin v. Husted*, 764 F.3d 646, 650-51 (6th Cir. 2014). But when prevailing parties—no matter who they are—help enforce a civil rights statute, they are entitled to fees. Shelby County's problem here is not that this lawsuit may have upset some observers. We find Shelby County not entitled because its lawsuit did not enforce compliance with the VRA and because Congress did not intend to use fees to encourage the invalidation of the Act's provisions.

In the same vein, Shelby County argues that we should be guided here by the analysis that persuaded the court to grant fees in *Lawrence v. Bowsher*, 931 F.2d 1579 (D.C. Cir. 1991). In that case, the district court dismissed a former federal employee's claim that he had been unlawfully discharged from his job, finding that he had not first exhausted the administrative remedies required under Title VII. *Id.* at 1580. The plaintiff successfully argued to us that Title VII did not apply to his class of federal employees and so he was not subject to an exhaustion requirement. *Id.* As a result, other federal employees who belonged to the same category as the plaintiff were then excluded from the scope of Title VII and no longer benefitted from its protections. *Id.* After prevailing, the plaintiff sought attorneys' fees under Title VII. *Id.* The district court refused to grant fees, concluding that a plaintiff whose lawsuit "was positively harmful to the civil rights of others" should not receive a fee award under a civil rights statute. *Id.* (internal quotation marks omitted). We disagreed, holding that "[a] district court may not deny fees to a prevailing plaintiff simply because his litigating position, although a correct interpretation of the law, does not comport with the court's vision of a position that would, in a broad sense, protect civil rights." *Id.* (internal quotation marks omitted). Shelby County submits that this case is exactly

analogous to *Lawrence v. Bowsher*: We should not deny fees simply because some observers find the invalidation of the coverage formula undesirable as a matter of policy. We disagree with Shelby County's reading of *Lawrence v. Bowsher*. We think that case helps illustrate exactly how Shelby County's suit differs from those in which prevailing parties are entitled to fees. The plaintiff there contributed to enforcement of Title VII by defining the category of individuals that Congress intended to protect, ensuring that the actions Congress meant to prohibit—and no other actions—would be prosecuted. That is precisely the kind of private enforcement action Congress meant the fee-shifting provision to encourage. Not so here. Shelby County defeated Congress's plans for enforcement of the VRA by invalidating the coverage formula and immobilizing section 5. Of course, as we have learned, Congress's plans violated the Constitution. But Shelby County's suit, unlike the suit in *Lawrence v. Bowsher*, did not contribute to enforcement of the VRA. For that reason Shelby County is not entitled to fees.

Finally, Shelby County argues that the approach we have taken to understanding section 14(e) is in error. Shelby County accepts that the Supreme Court has several times, in *Piggie Park*, *Christiansburg Garment*, and *Zipes*, discussed and relied on the purposes Congress intended to advance through fee awards. And Shelby County admits that in those cases the Court explained that prevailing parties are entitled to fees when their lawsuits advanced one or another purpose that Congress planned to advance by enacting the fee-shifting provision. Shelby County even acknowledges that we have adopted the *Piggie Park* standard to govern fee entitlement under section 14(e). *See Donnell*, 682 F.2d at 245. Yet Shelby County insists nonetheless that neither we nor the Court has ever taken the additional step of determining the specific kind

of plaintiff, argument, or motivation that Congress had intended to reward with fees. But we have not based our approach on such considerations. Rather, we have applied the *Piggie Park* standard as directed by the Court and as urged by Shelby County. Under that standard, we have considered whether the outcome of Shelby County's suit—the invalidation of the coverage formula of the VRA—was the kind of outcome that Congress thought would enhance enforcement of the VRA and made fees available to promote. We think it was not. Therefore Shelby County is not entitled to fees.

### C

Even though Shelby County has based its argument for fees entirely on *Piggie Park*, the district court considered whether Shelby County might also be entitled to fees under the *Christiansburg Garment* standard, which would allow a fee award only if the Government's defense of the coverage formula's constitutionality was frivolous or without foundation. *See Shelby County*, 43 F. Supp. 3d at 68-71. But since Shelby County has never maintained that it could even theoretically obtain fees under that standard, we do not believe we should resolve whether *Christiansburg Garment* should sometimes apply in cases like this one. It is enough to resolve this fee dispute by holding that Shelby County is not entitled to fees under the only standard it has urged us to apply.

### III

For the foregoing reasons, we affirm the district court's denial of Shelby County's application for attorneys' fees.

TATEL, *Circuit Judge*, concurring: Although I agree with Judge Griffith that Shelby County is not entitled to recover attorneys' fees, I find nothing at all "difficult" about the question whether the County is even *eligible* for fees under section 14(e) of the Voting Rights Act. *See* Op. at 14. Resolving this case on that threshold issue, moreover, would not require us "to decide more . . . [than] necessary," *id.* at 15 (internal quotation marks omitted)—or, for that matter, *any* new question of law.

Recall that Shelby County is eligible for fees only if its lawsuit—an action to invalidate the VRA's preclearance regime—qualifies as an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e). As filed and briefed, the County's suit does not meet this standard. Neither in its complaint nor in any brief filed in the district court, this court, or the Supreme Court did Shelby County even hint that its suit would protect any voting right guaranteed by the Fourteenth or Fifteenth Amendment. Instead, as Judge Bates recognized in rejecting the County's request for fees, Shelby County expressly and repeatedly stated that it sought to enforce the *Tenth Amendment* by "vindicat[ing] federalism interests and the 'fundamental principle of equal sovereignty' among the states." *Shelby County, Alabama v. Holder*, 43 F. Supp. 3d 47, 57 (D.D.C. 2014) (quoting Compl. ¶ 43); *see also* Br. for Shelby County at 23, *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013) (contending that VRA preclearance provisions "encroach[ed] on Tenth Amendment rights"). Indeed, in its cert petition, Shelby County framed the relevant question as whether Congress's reauthorization of Section 5 of the Voting Rights Act "exceeded its authority under the Fifteenth Amendment *and thus* violated the Tenth Amendment and Article IV of the United States Constitution," and it was on this issue that the County ultimately prevailed. *See Shelby County*, 133 S. Ct. at 2623, 2631 (invalidating VRA's preclearance coverage formula

under Tenth Amendment). But now seeking to qualify for fees under section 14(e), the County has changed its tune, claiming that its suit in fact sought to enforce the Fourteenth and Fifteenth Amendments' "voting guarantees," 52 U.S.C. § 10310(e), by vindicating what it calls those Amendments' "guarantee of local voting autonomy," Appellant's Reply Br. 3. This claim is meritless.

Anyone wishing to discover what "voting guarantees" the Fourteenth and Fifteenth Amendments protect must begin with the Amendments' text. Section One of the Fifteenth Amendment provides that the "right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Section One of the Fourteenth Amendment declares, among other things, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

Obviously, neither of these provisions includes any guarantee of state autonomy over voting. By its plain terms, the Fifteenth Amendment enshrines only one "voting guarantee," i.e., the "right of citizens of the United States to vote" free from discrimination based on "race, color, or previous condition of servitude." Furthermore, and contrary to Shelby County's claim that the Amendment protects "state autonomy over voting," Appellant's Reply Br. 14, the Amendment's prohibition against discrimination is expressly directed at the states. And although the Fourteenth Amendment says nothing about "voting guarantees"—indeed, as adopted, the Amendment did not even protect the right to vote—the Supreme Court has subsequently interpreted the Amendment's Equal Protection Clause as "guarantee[ing] the opportunity for equal participation by all voters." *Reynolds v. Sims*, 377 U.S. 533, 566 (1964). Like the Fifteenth

Amendment, moreover, it secures that right against the states. The two Amendments thus "guarantee" not state autonomy, but rather the right of citizens to vote, and they expressly guarantee that right against state interference.

Shelby County, however, claims to have found a "concomitant guarantee[]" of local voting autonomy lurking in the two Amendments' enforcement provisions. Appellant's Br. 14. That Congress may enforce the Amendments only by "appropriate" legislation, the County insists, means that the enforcement provisions guarantee "the constitutional right of sovereign States . . . to regulate state and local elections as they see fit." *Id.* at 43. But this claim finds no support in the constitutional text. Section Two of the Fifteenth Amendment provides that "[t]he Congress shall have power to enforce this article by appropriate legislation." Using virtually identical language, Section Five of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." By their plain text, neither clause "guarantees" any right, voting or otherwise. Rather, they give Congress power to enforce the "articles," i.e., equal protection of the laws (Fourteenth Amendment) and the right of citizens to vote free from discrimination based on race (Fifteenth Amendment).

Shelby County cites nothing to support its argument that the two enforcement clauses somehow also protect state autonomy, and for good reason. Added to the Constitution in the wake of this nation's bloody civil war to "take away all possibility of oppression by law because of race or color," *Ex parte Virginia*, 100 U.S. 339, 345 (1880), the Amendments were intended to *limit* state autonomy, not protect it. Owing largely to their enforcement provisions, *see id.*, they "establish[ed] . . . the federal government as the main protector of citizens' rights," granting "the national state the

authority to intervene in local affairs to protect the basic rights of all American citizens," Eric Foner, *The Supreme Court and the History of Reconstruction—and Vice Versa*, 112 COLUMBIA L. REV. 1585, 1587 (2012).

The Supreme Court has long recognized this proposition. In *Ex parte Virginia*, decided just years after the Fifteenth Amendment's ratification, the Court declared that the Reconstruction Amendments "were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress." 100 U.S. at 345. With respect to Congress's power to enforce the Amendments, the Court explained:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws *against State denial or invasion*, if not prohibited, is brought within the domain of congressional power.

*Id.* at 345–46 (emphasis added). In *Fitzpatrick v. Bitzer*, the Court, elucidating Congress's authority to enforce the substantive guarantees of the Fourteenth Amendment, recognized that the Amendment "quite clearly contemplates limitations on [the states'] authority." 427 U.S. 445, 453 (1976). And in *City of Boerne v. Flores*, the Court, harkening back to *Ex parte Virginia*, emphasized that the Reconstruction Amendments' enforcement provisions ensure that Congress has "the power to make the [Amendments'] substantive constitutional prohibitions against the States effective." 521 U.S. 507, 522 (1997). The Court explained that they constitute a "positive grant of legislative power to Congress,"

authorizing "[l]egislation which deters or remedies constitutional violations . . . even if in the process it . . . intrudes into legislative spheres of autonomy previously reserved to the States." *Id.* at 517–18 (internal quotation marks omitted).

Given this century and a half of precedent, rejecting Shelby County's argument hardly requires that we "make constitutional pronouncements," Op. at 15 (internal quotation marks omitted), or otherwise attempt to delimit, once and for all, the precise contours of the Reconstruction Amendments, *see id.* at 14, 21. It suffices to recognize, as the Supreme Court has time and again, that the Fourteenth and Fifteenth Amendments protect not state autonomy, but rather individual rights "against State denial or invasion." *Ex parte Virginia*, 100 U.S. at 346.

Of course, Congress's remedial authority under the Fourteenth and Fifteenth Amendments is "not unlimited," as it "extends only to *enforcing* the provisions of [those] Amendment[s]." *City of Boerne*, 521 U.S. at 518–19 (emphasis added) (internal quotation marks and alteration omitted). But when Congress oversteps the limits of that power, it does not, as Shelby County contends, violate any "guarantee" of the Fourteenth or Fifteenth Amendment. Instead, as always happens when Congress exceeds its enumerated authority and breaches the bounds of federalism, it violates the Tenth Amendment, which reserves to the states all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 919 (1997); *New York v. United States*, 505 U.S. 144, 177 (1992). Indeed, as noted above, such was the basis for Shelby County's original complaint in this very case, as well as for the Supreme Court's decision in the County's favor. Put in terms of the

VRA's fee-shifting provision, then, Shelby County brought this case to enforce the *federalism* "guarantees" of the Tenth Amendment, not the "voting guarantees" of the Fourteenth or Fifteenth Amendment. Shelby County is thus ineligible for attorneys' fees.

Finally, I agree with Judge Silberman that Shelby County would have been eligible for fees had it prevailed in a suit brought on behalf of voters to vindicate their Fourteenth and Fifteenth Amendment rights to be free from discrimination in voting. But that is not the case the County filed.

SILBERMAN, *Senior Circuit Judge*, concurring in the judgment:  At oral argument, I asked counsel for the NAACP (originally the intervenor) the following hypothetical.  Suppose a new Congress were to pass a version of the Voting Rights Act that was discriminatory to African-American voters.  If you sued and prevailed on grounds that the new statute violated both the "right to vote" under the Fifteenth Amendment (which protects against interference by both the states *and the United States*), as well as the right to vote pursuant to the equal protection clause of the Fourteenth Amendment, *see Reynolds v. Sims*, 377 U.S. 533 (1964), would you be entitled to attorney's fees under the Voting Rights Act.  The answer was unequivocally yes, and I think that is correct.

But that dialogue demonstrates two logical flaws in the court's opinion.  The first is that the attorney's fees provision does not speak to suits to enforce the Voting Rights Act, similar to prior cases dealing with civil rights statutes, but "rather an action or proceeding to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments."  In other words, a suit that challenges the constitutionality of a version of the Voting Rights Act can not be rejected merely because it challenges the Voting Rights Act.  Therefore, much of the court's discussion on this point is irrelevant.

The second logical flaw, similar to the first, which the district court and Judge Griffith's opinion emphasize, is that it is allegedly inconceivable that any Congress would authorize attorney's fees for an action challenging the legality of the *very* statute in which attorney's fees are authorized.  The problem is that the statute authorizing attorney's fees was passed in 1975, whereas the recent statute challenged in this case was passed in

2006.[1] So, whether attorney's fees are allowed depends not on the view of the recent Congress, but rather on the words of the 1975 Congress.

I also disagree with the government that Shelby County could not have recovered fees because its lawsuit was inherently one on behalf of state autonomy. Actually, the original case could have been framed as one protecting the rights of *individual* voters in governed jurisdictions not to be discriminated against under the Fourteenth and Fifteenth Amendments. After all, the Section 5 procedure did limit the ability of voters to expeditiously change various voting practices and insofar as the formula for inclusion of covered jurisdictions was arbitrary, it was discriminatory. (Indeed, Section 2 of the Fourteenth Amendment actually speaks of preventing the right to vote of anyone being in any way "abridged."[2])

Nevertheless, I concur in the judgment in this case because I agree with Judge Tatel that the original suit was not brought on behalf of the individual voting rights of the citizens of Shelby County. Whether this goes to eligibility or entitlement – the concepts are interrelated in the court's opinion – it is sufficient to conclude the action was *not* brought to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment. It is simply not enough to rely, as does Shelby County, on their original argument that the statute was not

---

[1] Section 14(e) was originally codified as 42 U.S.C. §1973l(e), but was later recodified with the Voting Rights Act as a whole into Title 52.

[2] Although a specific remedy is provided. It is not clear whether, and if so, how, it may be implemented by statute; in any event, it was not relied upon by Shelby County.

"appropriate" within the meaning of those amendments, because its claim of inappropriateness – at least originally – was only based on precepts of federalism of the Tenth Amendment, not individual voting guarantees.