# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 5, 2026

Lyle W. Cayce
Clerk

———————

No. 24-11040

———————

BENJAMIN KUNZE; ASHLEY AGURA; JACQUELINE BEELER; ALEXANDRA BEWLEY; VILASBEN BHUT; RYAN BIALASZEWSKI; RYAN ENGLISH; TASHA HUDSON; STEPHEN KRIVAN; TYLER LEMM; CINDY LIN; MICHELLE NICKELATTI; SANDEEP PALIKHEL; TAYLOR VAUGHN; KARA WILHITE; KATIE ZILIAK, *On Behalf of Themselves and All Others Similarly Situated*,

> *Plaintiffs—Appellants/Cross-Appellees*,

HEATHER BENDER; LAUREN BOWMAN,

> *Appellants/Cross-Appellees*,

> *versus*

BAYLOR SCOTT & WHITE HEALTH; HEALTHTEXAS PROVIDER NETWORK,

> *Defendants—Appellees/Cross-Appellants*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CV-1276

———————————————————

Before WIENER, ENGELHARDT, and OLDHAM, *Circuit Judges*.

No. 24-11040

Per Curiam:[*]

Plaintiffs-Appellants—hospital employees—individually and on behalf of a Fair Labor Standards Act ("FLSA") collective, appeal the district court's award of attorneys' fees and costs. Defendants-Appellees—hospital employers—cross-appeal to challenge just the attorneys' fees ruling. Put simply, plaintiffs argue the district court's award was too low, while defendants argue the award was too high. We conclude the district court issued an award that was just right, according to its carefully exercised discretion. We AFFIRM.

Before this litigation began, defendant HealthTexas Provider Network ("HealthTexas") discovered an issue with its timekeeping system that affected wage payments for a small number of employees. HealthTexas audited its system and promptly made corrected wage payments to the affected employees. The following year, the plaintiff employees filed this FLSA collective action, alleging the defendant hospitals failed to pay overtime compensation. The plaintiffs eventually won summary judgment on their claims against HealthTexas (but not defendant Baylor Scott & White Health). The parties settled the remaining issues, save for attorneys' fees and costs. After the district court approved the parties' settlement agreement, plaintiffs moved for over $3 million in attorneys' fees and nearly $101,000 in costs. The district court, applying the requisite legal standards, exercised its discretion to reduce the fee award to $919,000. It likewise reduced costs to about $16,519, accounting for only the cost categories expressly permitted under 28 U.S.C. § 1920.

The court reviews "a district court's determination of reasonable attorneys' fees for an abuse of discretion and all findings of fact supporting the

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

award for clear error." *Cruz v. Maverick Cnty.*, 957 F.3d 563, 574 (5th Cir. 2020). District courts abuse their discretion when they: "(1) rel[y] on clearly erroneous factual findings; (2) rel[y] on erroneous conclusions of law; or (3) misappl[y] the law to the facts." *Combs v. City of Huntington*, 829 F.3d 388, 391 (5th Cir. 2016) (internal quotation marks and citation omitted). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1043 (5th Cir. 2010) (citation modified). And when assessing challenges to the district court's lodestar adjustment, we determine whether the district court "sufficiently *considered* the appropriate criteria." *Cruz*, 957 F.3d at 574 (internal quotation marks and citation omitted).

The court has reviewed the briefs, record, applicable law, and the district court's carefully reasoned order. Having done so, we conclude the district court did not abuse its discretion in awarding attorneys' fees and costs. The district court's factual findings on hours and billable rates were not clearly erroneous. And it adequately applied the relevant legal standards for awarding attorneys' fees and costs in FLSA cases. The district court considered the *Johnson* factors in evaluating defendants' request to reduce the lodestar, using proportionality to approximate the degree of reduction necessary based on the factors. It also appropriately considered preclusion from other employment in its reduction of the lodestar, consistent with this court's decisions in *Rodney v. Elliott Security Solutions, L.L.C.*, 853 F. App'x 922, 925–26, 926 n.5 (5th Cir. 2021), and *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 258 (5th Cir. 2018). Given the district court's "leeway in adjusting the lodestar and its superior understanding of the litigation," we conclude the district court did not abuse its discretion in awarding fees and costs. *Gurule*, 912 F.3d at 259 (citation modified).

Plaintiffs' request for appellate attorneys' fees is denied. "An additional fee to compensate counsel for their services in connection with the appeal can be awarded in a FLSA case when the appellate court considers such an award appropriate." *Gagnon*, 607 F.3d at 1044–45 (citation modified); *Cruz*, 957 F.3d at 575 (prevailing plaintiffs "*may* recover an additional fee to compensate counsel for their services in connection with the appeal" (emphasis added) (internal quotation marks and citation omitted)). Here, we conclude no appellate attorneys' fees are appropriate. Both parties appealed, and both were unsuccessful. *See Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1557 (10th Cir. 1988) (concluding appellate attorneys' fees were not appropriate where cross-appellant plaintiff prevailed on only some issues on appeal and did not prevail on its cross-appeal). And the sole issues raised in this appeal are straightforward questions concerning the propriety of the fee and cost awards, not the merits of plaintiffs' claims. *See Saglimbene v. Venture Indus. Corp.*, 895 F.2d 1414, 1990 WL 10709, at *9 (6th Cir. 1990) ("Because the issues raised in this appeal are not particularly complex, we do not believe that an award of costs or attorney's fees is appropriate in this [FLSA] case."). We reject plaintiffs' request for appellate attorneys' fees.

The judgment of the district court is AFFIRMED.

4

No. 24-11040

Andrew S. Oldham, *Circuit Judge*, concurring:

I concur because the majority opinion faithfully applies our precedent. Or at least I think it does. I write separately, however, to emphasize just how messy and indeterminate our fee-shifting doctrine is.

I

Our legal forefathers in England fully embraced fee-shifting. Under the so-called "English rule," the loser pays both his attorneys and his opponent's. The "American rule" is different. And it generally embraces the idea that parties—not outcomes—determine how much attorneys get paid. I begin with (A) England and then turn to (B) America.

A

For almost a thousand years, English law has embraced the idea that the loser pays the winner's court costs. The first hint of this rule appears in a 1267 law called the Statute of Marlborough. 52 Hen. 3 c. 23 (1267). That law asserted that if a lord maliciously impleaded his tenants "on a pretext" that they made an old deed called an feoffment "to defeat his wardships," the tenants would be able to recover damages and costs. 4 W. S. Holdsworth, A History of English Law 537 (1st ed. 1923). And in 1275, the Statute of Gloucester arrived at a similar result. It allowed successful plaintiffs in real property disputes to recover court costs. *Ibid.* Notably, in these early iterations of fee shifting rules, a defendant could never recover costs.

While both early statutes set out a narrow rule that applied only to plaintiffs, and only in certain kinds of disputes, the principle that the loser should pay the winner soon expanded. The first innovation was that it grew to cover defendants. In the 1500s, for example, various laws "allowed

5

successful defendants to recover costs." *Id.* at 538. [1] And by 1607, a statute allowed "defendants . . . to recover costs in all actions in which the plaintiff was entitled to costs." *Ibid.* The principle was simple: the plaintiff was entitled to costs if he won, and the defendant was entitled to costs if he won. With such a principle came parity—the loser would always pay the winner.

A second innovation soon followed. The fees that a lawyer could recover from a defeated opponent were "subject to taxation by the court." John Leubsdorf, *Toward a History of the American Rule on Attorney Fee Recovery*, 47 L. & CONTEMP. PROBS. 9, 12 (1984) (citing An Act for the Better Regulation of Attornies and Solicitors, 2 Geo. 2 c. 23, § 23 (1729)). That general rule meant that the court would take fees from the loser, decreasing the winner's share. In this sense, attorneys and court staff were both in business for themselves. *See ibid.*; 1 SIR WILLIAM HOLDSWORTH, A HISTORY OF ENGLISH LAW 246–49; 255–62 (7th ed. 1956).

And how much were those fees? Neither the victor nor the court wanted to soak the loser. Instead, they sought a reasonable wage. *Cf.* Leubsdorf, *supra*, at 12. As with many things in English law, whether a wage was "fair" was a matter of unwritten custom and tradition. *Ibid.* But it basically boiled down to whether the lawyer's rate was customary. *Ibid.*

B

America charted a different path. Consistent with our broader practice of preferring written laws over unwritten codes, (1) Americans started with statutory caps on attorneys' fees. That gave way to (2) a different

---

[1] Around the same time, English law allowed plaintiffs to bring suits *in forma pauperis*. 4 W. S. HOLDSWORTH, *supra*, at 538. How did this development pair with the idea that the loser should pay? If a pauper lost, he faced non-pecuniary penalties like whipping. *Munford v. Pait* (1665) 1 Sid. 261, 82 ER 1093.

American ideal—freedom of contract—and the rights of Americans to pay their lawyers an agreed-upon rate. Correlatively, Americans generally do not make contracts with their adversaries' lawyers and hence generally do not pay their adversaries' fees. But consistent with the broader schizophrenia that Americans have toward lawyers, we also have (3) prevailing-party statutes that are more evocative of the English Rule than the American one.

1

In an effort to make sure that lawyers' fees were set at reasonable levels, early American legislators set statutory limits on fees. *See generally* ANTON HERMANN CHROUST, THE RISE OF THE LEGAL PROFESSION, 232–77. The big idea behind early attorneys' fee statutes was that lawyers should not charge higher fees than what they recovered for their clients. *See, e.g.*, 1778 Va. Acts, ch. 14, § 5, in A COLLECTION OF ALL SUCH PUBLIC ACTS OF THE GENERAL ASSEMBLY, AND ORDINANCES OF THE CONVENTIONS OF VIRGINIA, PAID SINCE THE YEAR 1768, AS ARE NOW IN FORCE 84 (Richmond 1785). These statutes thus placed a limit on what attorneys could earn.

Enterprising lawyers soon tried to develop workarounds to the statutory caps. First, attorneys sought a percentage of the damages award as a matter of right. *Cf.* Leubsdorf, *supra*, at 12–16. But in 1793, the Supreme Court appeared to reject a lawyer's attempt to collect money from his client's damages award. *See generally Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306 (1796). The Court explained that "[t]he general practice of the United States is in opposition to" allowing lawyers to recover a percentage of the award. *Ibid.* The Court added that even if that bar were "not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute." *Ibid.*

No. 24-11040

That did not dissuade lawyers from continuing to ask for portions of their clients' winnings. At times, courts rebuffed such arguments by relying on the Supreme Court's decision in *Arcambel*. For example, in *Whittemore v. Cutter*, Justice Story did not allow a plaintiff to admit into evidence what his legal expenses would be. *Whittemore v. Cutter*, 29 F. Cas. 1120 (C.C.D. Mass. 1813) (No. 17,600) (Story, Circuit Justice). Such an admission would have let the court include legal expenses when it was ruling on a damages award. But to Justice Story, that would violate *Arcambel*, which seemed to forbid just that practice. *Ibid.*

But the history at times points in the opposite direction. Some courts let plaintiffs present just the kind of evidence that *Arcambel* barred. For example, in at least two cases, early courts explained that plaintiffs could introduce evidence of their legal fees and obtain higher damages awards. *See Boston Mfg. Co. v. Fiske*, 3 F. Cas. 957, 957–58 (C.C.D. Mass. 1820) (Story, Circuit Justice); *The Appollon*, 22 U.S. (9 Wheat.) 362, 379 (1824).

2

Perhaps spurred by the uncertainty of this regime, American lawyers soon developed a second solution. Rather than rely on judicial discretion *ex post*, lawyers would contract with their clients *ex ante* to share potential winnings.

This practice soon gained wide acceptance. Courts blessed the new arrangement. Leubsdorf, *supra*, at 16; *See, e.g.*, *Bayard v. McLane*, 3 Del. (3 Harr.) 139, 217–22 (1840); *Stevens & Cagger v. Adams*, 23 Wend. 57, 63 (N.Y. Sup. Ct. 1840), *aff'd*, 26 Wend. 451 (N.Y. 1841). And legislatures soon followed suit. In 1848, for example, New York's Field Code of Civil Procedure set out that "hereafter the measure of such compensation shall be left to the agreement, express or implied, of the parties." First Report of the Commissioners on Practice and Pleading, Code of

8

PROCEDURE 208 (1848). States across the nation soon adopted that code. *Cf.* William Wirt Blume, *Adoption in California of the Field Code of Civil Procedure: A Chapter in American Legal History*, 17 HASTINGS L.J. 701, 702–08 (May 1966) (exploring the adoption of the Field Code).[2]

The logic of allowing lawyers and clients to reach arms-length agreements put pressure on statutory limits too. The New York Code's drafters, for example, could not "perceive the right of the state, to interfere between citizens, and fix the compensation which one of them shall receive from the other, for his skill or labor. . . . It has no more just right to do this, than it has to fix the price of property." FIRST REPORT, *supra*, at 204–05. If the best way to fix the value of a lawyer's services was negotiation between lawyer and client, it followed that courts and legislatures should not set the amounts. As the Commissioners explained, letting the court or jury fix an award amounted to "arbitrary discretion." *Id.* at 207 Rather, lawyers should set their fees "graduated in part by the necessary labor performed, and in part by the amount in controversy." *Ibid.* In short, the market ought to set the rate for legal services.

Congress later adopted this approach. In 1853, Congress passed a law declaring that lawyers could charge "such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties." An Act to Regulate the Fees and Costs to be allowed Clerks, Marshals, and Attorneys of the Circuit and District Courts of the United States, and for

---

[2] Courts likewise allowed victorious parties to obtain attorneys' fees if the victor recovered on behalf of a common fund. *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527, 533 (1881). The logic of that rule was that a lawyer was just getting paid by the fund's anonymous beneficiaries. *Cf. ibid.* The beneficiaries would have contracted the lawyer at a set hourly rate at the outset, so the lawyer was entitled to a reasonable recovery once the suit concluded.

other Purposes, ch. 80, 10 Stat. 161, 161 (1853); *see also* Leubsdorf, *supra*, at 21. Courts read this statute to prohibit parties from recovering attorneys' fees from the losing side—instead, the attorneys' fees would be fixed by contract at the start of the suit. Leubsdorf, *supra*, at 21–23. And hence the American Rule was formed.

3

America nonetheless has adopted some bits and pieces of England's loser-pays regime. Prevailing-party statutes are the most obvious examples. Take, for example, the Sherman Antitrust Act and its prohibition on large-scale economic monopolies. *See* 15 U.S.C. § 1. Under the Sherman Act, plaintiffs can recover legal expenses from violators. *Id.* § 4304. Same with the Interstate Commerce Act of 1887. Congress prescribed a series of rules for the railroad industry, and shifted attorneys' fees to a party who prevailed in a suit under that Act. *See* An Act to Regulate Commerce, ch. 104, § 8, 24 Stat. 379, 382 (1887).

As American government continued to grow, Congress continued to carve out exceptions from the American Rule to promote desirable conduct—and to punish social ills. For example, Congress spread English-style fee-shifting to civil rights violations, 42 U.S.C. § 1988(b), housing violations, 24 U.S.C. § 3613(c), and employment violations, 29 U.S.C. § 216(b), to name a few.

Even in these areas, however, Congress did not fully embrace England's loser-pays regime. For example, a defendant generally cannot recover prevailing-party fees under § 1988. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 429 n.2 (1983). Moreover, a prevailing plaintiff cannot recover such fees if the district court disagrees with the "purpose" of the lawsuit. *See Shelby County v. Holder*, 43 F. Supp. 3d 47, 61–70 (D.D.C. 2014), *aff'd sub nom. Shelby County v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015). Plaintiffs also

cannot recover fees if the district court finds the government's illegal regulation "substantially justified," even though the Supreme Court determined the government was wrong. *Gun Owners of Am., Inc. v. Bondi*, No. 25-1282, 2026 U.S. App. LEXIS 6030, at *2 (6th Cir. Mar. 2, 2026).

## II

All of that to say America has a long and complicated relationship with attorneys' fees. One particular dimension of that complicated relationship is presented in this case—namely, what constitutes a "reasonable" fee under America's fee-shifting statutes? I explain (A) the history of reasonableness for fee awards and (B) our court's twelve-factor test.

## A

America's courts have a long history of assessing "reasonable" loser-pays fees. *See* Bruce R. Braun & W. Gordon Dobie, *Litigating the Yankee Tax: Application of the Lodestar to Attorneys' Fee Awards in Common Fund Litigation*, 23 Fla. St. U. L. Rev. 897, 901 (1996). But the reasonableness doctrine, as initially developed, was entirely ad hoc and unpredictable.

So in 1973, the courts began to make the process more scientific. The Third Circuit, for example, developed what became known as the "lodestar" method of setting attorneys' fees. *See Lindy Bros. Builders of Phila. v. Am. Radiator & Standard Sanitary Corp*, 487 F.2d 161, 168 (3d Cir. 1973). The court would inquire into "how many hours were spent in what manner by which attorneys," and then would multiply that number by a reasonable hourly rate. *Id.* at 167.

The Supreme Court eventually adopted the Third Circuit's lodestar method. *See Hensley*, 461 U.S. at 433–34. The Court has recognized that it "produces an award that *roughly* approximates the fee that the prevailing attorney would have received . . . in a comparable case." *Perdue v. Kenny A.*

No. 24-11040

*ex rel. Winn*, 559 U.S. 542, 551 (2010). It "is readily administrable." *Ibid.* And it is "objective." *Hensley*, 461 U.S. at 433.

B

Our circuit's method is none of those things. We instead invented a twelve-factor test to assess what fees were reasonable. We consider: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee was fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount of time involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case;[3] (11) the nature and length of the professional relationship with the client; (12) and awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). Easy as 1–2–3 . . . 4–5–6–7–8–9–10–11–12.

Where did these factors come from? In brief, nowhere. *See ibid.* (offering no citations for many of the factors). Worse, this circuit's twelve-factor test is neither predictable *ex ante* nor clear *ex post*. Instead, it shares a

---

[3] The court based this factor on the idea that civil rights lawyers deserved extra compensation because the "decision to eradicate discrimination is not pleasantly received by the community or [a lawyer's] contemporaries." *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 719 (5th Cir. 1974). The concern was that such litigation can "have an economic impact on [a lawyer's] practice"—in other words, representing meritorious civil rights plaintiffs could have been career suicide in the old South. *Ibid.* Of course, civil rights suits are no longer the disfavored cases of yesteryear but are instead regularly championed by the largest law firms in America—often for free. What's more, this factor asks courts to tip the scales towards particular causes while noting that others are less deserving. Such questions are the kind of value judgments that courts are particularly ill-equipped to address. *But see Shelby County*, 43 F. Supp. 3d at 56–70 (denying fees because the plaintiffs' federalism concerns were apparently worth less than the supposed "voting guarantees" of the Fourteenth and Fifteenth Amendments).

classic attribute with other balancing tests: it is "utterly indeterminate." *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 565 U.S. 994, 994 (2011) (THOMAS, J., dissenting from the denial of certiorari). It gives "very little actual guidance to district courts." *Kenny A.*, 559 U.S. at 551 (quotation omitted). It uses "sometimes subjective factors" that "place[] unlimited discretion in trial judges and produce[] disparate results." *Ibid.* (quotation omitted).

Still, we plow ahead undeterred. And adding confusion to indeterminacy, we even call our laundry-list doctrine the lodestar method. *See, e.g.*, *Rodney v. Elliott Sec. Sols., L.L.C.*, 853 F. App'x 922, 925–26 (5th Cir. 2021); *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 258 (5th Cir. 2018). The irony is readily apparent. Federal courts created the lodestar method to impose order and predictability on the preexisting reasonableness doctrine. Our court, on the other hand, remains in the dark ages; continues to use an utterly indeterminate twelve-factor test that no one can predict or understand; and nonetheless calls it a "lodestar" analysis.

## III

This case is a prime example of why our circuit's approach to fee awards is out of step with the history of the American rule and makes zero sense whatsoever.

Plaintiffs are eighteen hospital employees who sued their employer, HealthTexas Provider Network, and the hospital system in which they worked, Baylor Scott & White, for unpaid wages. The plaintiffs tried to certify a class action. Their attempt failed, so the parties settled. The plaintiffs' lawyers then sought $3,131,091 in attorneys' fees and $100,971.15 from the defendants.

Evaluating that request should go as follows: Plaintiffs rely on a statutory scheme allowing them to recover "reasonable" attorneys' fees. 29

U.S.C. § 216(b). So the only question on appeal should be: Is an attorneys' fees award of more than $3,000,000 reasonable for the work the lawyers did?

Under this circuit's tortured test, however, this issue has been litigated using made-up and under-theorized standards. Plaintiffs assert that the district court misapplied two of the twelve *Johnson* factors: the preclusion of other employment by the attorney because of acceptance of the case (factor four) and the amount of time involved and the results obtained (factor eight). Plaintiffs' attorneys make this point by comparing their effort to "trench warfare." Blue Br. at 35. Their logic seems to be that if they complain enough about the work they voluntarily assumed, that means the district court wrongly considered two of *Johnson*'s twelve factors.

What any of that has to do with whether their fee award is "reasonable" is beyond me. It is disconnected from the statutory text, which states that a court "shall . . . allow a *reasonable* attorney's fee to be paid by the defendant" along with "the costs of the action." 29 U.S.C. § 216(b) (emphasis added). It's disconnected from our Nation's historical practice. And it's disconnected from the lodestar method that the Supreme Court embraced and that imposes some modicum of clarity on a confusing area of law.